Fuld, J.
Knocked out by Roger Donoghue in the eighth round of a bout held in Madison Square Garden on August 29, 1951, following two very hard blows to the head, George Flores died several days later of cerebral hemorrhage and cerebral edema. This suit for wrongful death followed, it being alleged by his administrator that the State of New York was negligent in licensing and permitting Flores to fight when it knew, or should have known, that he was not in proper physical condition to engage in the fight. Flores had participated in two earlier fights, one on July 24, the other on August 14 (also against Donoghue), and each had come to an end when Flores suffered a technical knockout. The claim of negligence is based on the hypothesis that death was not the result of the blows received *407 in his last fight, but rather the aggravation of a brain injury previously suffered, which should have been detected by the doctors, assertedly employees of the State, who found him physically fit to fight.
Flores had been examined before and after each of the fights by physicians selected, the record indicates, by the corporation promoting the matches from a panel set up by the Medical Advisory Board of the New York State Athletic Commission. The doctor who examined him after the conclusion of the first fight, on July 24, found him “ O.K.” Dr. Bockner, who was at the second fight, examined him twice, several hours apart, before the match got under way and described his ‘ ‘ physical condition [as] perfect.” Then, after the fight had been stopped, the doctor again examined him twice —■ in the ring immediately after the knockout and, the second time, a half hour later, in his dressing room. Observing that Flores had suffered no cuts, no bruises and no concussion and that his heart, his system and reflexes were all “ perfectly normal,” Dr. Bockner expressed the opinion that he “ left the ring in good shape and * * * could continue to fight.” When application was made for Flores to take part in a match to be held on August 29, an electroencephalogram (EEG-) was ordered as a precautionary measure and Flores was considered “suspended” until the results of the encephalogram became known. One was taken and it revealed no abnormality and was interpreted as “ normal ” and “ generally good”; although it did indicate a “slowing anteriorly ”, that was not significant, it was said, because no earlier tracing was available for comparison.
The physician present at the last fight was Dr. Nardiello. Aware of Flores’ earlier technical knockouts, the doctor testified that he not only “ spen[t] a lot of time with him,” subjecting him' to a thorough physical examination shortly before the bout began, but that he also studied the reports of the other doctors and the electroencephalogram taken some days before. Based on all this, it was Dr. Nardiello’s opinion that Flores was ‘ ‘ in excellent condition. ’ ’ Indeed, it was his view — as well as of Donoghue, Flores’ opponent —that he met his death as a result of injury sustained during the fight itself; the blow, a devastating one, was a left hook to the head, a “ hard * * * solid punch,” “with [Don *408 oghue’s] full weight behind it,” “ perfectly timed and perfectly thrown. ’ ’
Flores went into a coma some hours after the fight. A brain operation was performed which was unsuccessful in saving his life. The surgeon who performed the operation, Dr. Daniels, testified that he observed “ no scar tissue ” and “ no evidence ” of any “ injury pre-existing the .injury ” received in the ring during the August 29th bout, but he voiced an opinion, in answer to a hypothetical question, that Flores may have sustained a concussion before that date. Dr. Helpern, the medical examiner who performed the autopsy, stated that he found no indications of any prior injury.
On the other hand, Dr. Somberg testified that, based on his examination of the medical record, it was his opinion that Flores had received injuries in the earlier contests and that death was caused “by the damage that he took” in those fights, “ plus the damage in the third fight, plus the damage of his head striking the canvas.” Dr. Somberg also asserted that it was better medical practice that a boxer severely beateri about the head should not fight again for six weeks or two months.
The Court of Claims awarded the claimant $80,000; it was its view that the doctors who examined Flores were servants of the State and that they were negligent in not discovering that he had suffered a brain injury before his last fight. Upon appeal, the judgment was reversed and the claim dismissed. Although it expressed a “ serious doubt ” as to whether the doctors were employees of the State, the Appellate Division found it unnecessary to decide that question, holding that, even assuming the existence of an employer-employee relationship, the claimant failed to establish either negligence or causation.
Our approach is different. We choose to place our decision on the ground not decided by the Appellate Division and, accordingly, we do not pass upon the issue of negligence. Study of the problem persuades us that the doctors were not employees of the State and, consequently, even if they were careless, their negligence could not in any event be imputed to the State.
Although this State has wisely waived its sovereign immunity against suit generally (Court of Claims Act, § 8) and, perhaps, *409 “ more completely than any other American jurisdiction ” (Herzog, Liability of the State of Hew York for “Purely Governmental ” Functions, 10 Syracuse L. Eev. 30), it is essential, at the very least, that the person for whose negligent conduct the State is sought to be charged be engaged in its service. The doctors who examined Flores were, quite obviously, not employees of the State, but' it is suggested on behalf of the claimant that an intention on the part of the State to assume liability for the acts of these doctors is to be found in the legislation relating to boxing. Analysis of the statute, however, as well as its history, demonstrates the contrary.
“ The common law of Hew York,” it has been noted, “ placed no bar on the holding or conduct of [boxing] matches.” (Zwirn v. Galento, 288 N. Y. 428, 432-433.) However, for many decades the penal laws of this State contained a complete prohibition of prize fighting (L. 1856, ch. 98; Penal Code [L. 1881, ch. 676], § 458; now Penal Law, § 1710). Its reintroduction dates from 1911, when the Legislature passed a law permitting boxing exhibitions to be resumed under stringent regulations, subject to the supervision of a newly created State Athletic Commission, and provided that the contests were to be excepted from the ban of the penal laws (L. 1911, ch. 779). The objectives of this legislation were well described by Justice Seabury, as he then was, a few years after its enactment in Fitzsimmons v. New York State Athletic Comm. (15 Misc 2d 831, 833, affd. 162 App. Div. 904):
“ Confronted with the question as to whether it should prohibit prize fighting or sparring altogether, or leave such contests unaffected by legislation, the law-making body of this State has adopted a middle course and has legalized boxing when conducted under State control. Two main purposes have prompted such legislation: First, the desire to prevent as far as possible certain brutal and degrading features which have in the past sometimes attended such contests, and, second, to promote and protect such contests when conducted within the legitimate limits of a sport. To achieve those purposes the state has created the Athletic Commission and authorized that commission to prescribe stringent rules governing the conditions under *410 which such contests can be held. * * * Beading [the] two statutes together, it is apparent that the vocation of prize fighting or sparring is an occupation subject to governmental control.”
Further elaboration occurred with the enactment in 1920 of the so-called Walker Boxing Law- which, continuing the State Athletic Commission, has remained on the books without any fundamental changes to the present time (L. 1920, ch. 912, as amd. by L. 1948, ch. 754; L. 1952, ch. 666). The statute, exceedingly broad in its coverage, provides for rigid supervision of the premises in which the matches or exhibitions are held, of all who participate in the exhibitions in any capacity and of the methods of conducting the matches. The primary means employed to effect enforcement is a system of licensing, with exclusion of the unlicensed and power to penalize the licensed for violations or infringements. The standards imposed by the statute, it is provided, may be implemented by regulations promulgated by the commission, a power, we note, which has been frequently exercised.
The statute itself reflects a high concern for the physical fitness of the fighters scheduled to engage in the matches. Such fitness will, of course, enhance the competitive character of the contest and it may fairly be assumed that the Legislature was at least as concerned with the physical welfare of the contestants themselves. Accordingly, the statute, as it read in 1951 when the fight took place, prescribed that 11 All boxers must be examined by a physician designated by the commission before entering the ring” (§ 23, as amd. by L. 1948, ch. 754, § 5 [now § 25]), that a physician must be “ in attendance at every boxing * * * match” (§ 13, as amd. by L. 1948, ch. 754, § 3 [now § 26]) and that a report of physical examinations must be filed by the corporation promoting the match ‘ ‘ not later than twenty-four hours after the termination of the contest” (§ 23, as amd. by L. 1948, ch. 754, § 5 [now § 25]).[1] The doctors so employed are selected from a list of “ qualified physicians ’ ’ recommended to the commission 1 ‘ from time to time ” by its Medical Advisory Board, a body consisting of *411 nine members appointed by the Governor (§ 12-a, as added by L. 1948, eh. 754, § 2 [now § 4]; § 13, as amd. by L. 1948, eh. 754, § 3 [now § 26]). The board also recommends to the commission the fees for such physicians which are to be paid by the promoting corporation (ibid.). In addition, the board “from time to time” is to submit to the commission for approval “ such additional regulations and standards of examination as in their judgment will safeguard the physical welfare of professional boxers * * * licensed by the commission ” (§ 12-a, subd. 2, as added by L. 1948, ch. 754 [now § 4, subd. 2]).
Turning more directly to the action before us, the only negligence charged or found is that of the doctors who conducted the examination of Flores. But, on the plainest principles of construction, the State has carefully avoided making these physicians its own servants or employees. It is true that the State established the panel—which now consists of some 60 doctors, half of whom are in the New York City area—but this is only the customary exercise of the police power in the regulation of a permitted subject. All persons require a license to practice medicine in this State, and the establishment of a limited number of such doctors to .perform a specialized service is no more than similar selection for other subjects of specialization, §qch as psychiatry.
To be sure, the corporation promoting the contest was required to employ for this purpose a physician included on the panel. This, without more, is a phenomenon of everyday occurrence. No one would seriously suggest that every person to whom the State has issued a license to practice his profession or trade thereby becomes an employee or agent of the State. Nor is such a relationship created by virtue of the fact that the State may also prescribe the amount of the fee to be charged; regulation, no matter how close or stringent, is not thereby transmuted into government operation. Indeed, where the employment is made mandatory, it is not uncommon to prescribe the fee in order to prevent gouging. It is a familiar experience to many that only specially licensed tow trucks are permitted to come to the assistance of motorists on certain highways and that the towing fee is prescribed. By so doing, the authorities do not make themselves responsible for the manner in which the service is performed.
*412 There is nothing in the Walker Boxing Law or in the Rules of the State Athletic Commission which, suggests that the examining doctors, paid by the promoting corporation, are servants of the State or, in performing their duties, are subject to control or supervision by the commission. The plain fact of the matter is that, however stringent the requirements, the scheme embodied in the statute is solely a regulatory measure. Every such regulatory statute presupposes public purposes. The Legislature evidently considered that the reduction in the risk of permanent injury to fighters constituted such a purpose, and that was its right. There is no indication, however, that there was any design to transfer such risks to the State. By providing a safeguard through the requirement of a physical examination, the State did not undertake to insure that it would always be effective. It is difficult to conceive that the Legislature, in enacting the statute, ever considered the possibility that these doctors could be deemed servants of the State for whose negligence it would be held responsible. Precisely similar requirements are imposed for referees and judges whose fees are likewise prescribed by the commission (§§ 1, 7; Rules of Commission, former rule 41 [1ST. Y. Off. Comp, of Codes, Rules & Regulations, Vol. 2, p. 1220], now rule F, § 11 [N. Y. Off. Comp, of Codes, Rules & Regulations, 8th Off. Supp., p. 540]), and yet it could hardly be claimed that the State would be answerable in damages if, for instance, a referee negligently failed to terminate a bout. The State adopted a parallel scheme when it created the State Harness Racing Commission (Pari-Mutuel Revenue Law [L. 1940, ch. 254, as amd.], art. II, § 35 et seq., particularly §§ 41, 41-a, added by L. 1953, ch. 391, § 8) and, if the claimant’s position were here upheld, all racing officials who are licensed and have their compensation fixed by that commission would, by a parity of reasoning, become servants of the State. Such an enlargement of public employment should be made consciously if it is intended. Regulation is ordinarily regarded as a means of avoiding governmental operation, rather than a subtle embodiment of it. (See, e.g., Lavitt v. United States, 87 F. Supp. 149, affd. 177 F. 2d 627.)
In other words, although the State has by these measures sought to make a dangerous sport less dangerous and, indeed, may have retained a limited power of supervision over the *413 physical examinations provided for, that does not mean that the Legislature constituted the examining doctor a servant or employee of the State so as to render it liable for his negligent act. It is probable that, even in a purely private context, persons situated as are these doctors would be held to be “ independent contractors,” for whose independent negligent acts the party requesting the performance of the service would not be responsible. (Cf. Broderick v. Cauldwell-Wingate Co., 301 N. Y. 182, 187, and Moore v. Wills, Inc., 250 N. Y. 426, 428-429 [general contractor not liable for independent negligent act of subcontractor].) However that may be, though, we reject the novel thesis that a person may be a “constructive” state agent. Agency cannot be thrust upon the State against its will and' only the Legislature can authorize persons to perform services for the State as its servants, and this the Legislature carefully refrained from doing in the case of these doctors. Although we have come upon no decision by a New York court in which the contention urged by the claimant has been advanced, an argument not too unlike it was considered and rejected in a case arising under the Federal Tort Claims Act. (See Lavitt v. United States, 87 F. Supp. 149, 150-151, affd. 177 F. 2d 627, 630, supra.)
In the view which we have taken, we do not reach the question of the State’s responsibility if the doctors had been in its employ (see Herzog, op. cit., 10 Syracuse L. Rev. 30, 36-38). We rest our decision solely on the ground that, since the physicians who examined Flores were not employees or agents of the State, no suit may be maintained against it for their alleged negligence.
The judgment appealed from should be affirmed, without costs.

. The several sections were renumbered in 1952 and subjected to slight amendments in language (L. 1952, ch. 666).