**MUHAMMAD ALI, Plaintiff,**

v.

The **DIVISION OF STATE ATHLETIC COMMISSION OF the DEPARTMENT OF STATE OF the State of NEW YORK and Edwin B. Dooley, Albert Berkowitz and Raymond J. Lee, as Chairman and Members thereof, Defendants.**

**No. 69 Civ. 4867.**

United States District Court
S. D. New York.
Dec. 24, 1969.

Michael Meltsner, New York, N. Y., for plaintiff.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, for defendants; Charles A. LaTorella, Jr., Asst. Atty. Gen., of counsel.

## OPINION

FRANKEL, District Judge.

### I.

On April 28, 1967, the plaintiff, Muhammad Ali (also known as Cassius Clay), refused to submit to induction into the armed forces. He was at the time "recognized" in New York and elsewhere as the world's heavyweight champion prize fighter. His resistance to the draft was predicated, *inter alia,* upon a claimed ministerial exemption, a conscientious objector claim, and hardship grounds. On June 20, 1967, after rejection of his attacks upon the denial of an exemption for religious reasons, a jury found him guilty under 50 U.S.C.App. § 462 of criminally refusing induction, and he was sentenced to a term of five years in prison (subject, the District Judge said, to consideration of "clemency" if and when the conviction was affirmed).

On May 6, 1968, the Fifth Circuit affirmed. Clay v. United States, 397 F.2d 901. In an introductory summary at the outset of its detailed opinion, the Court said (p. 905):

"Cassius Marsellus Clay, Jr., also known as Muhammad Ali, heavyweight professional boxing champion of the world, was convicted after trial by jury on an indictment charging violation of 50 U.S.C.App. § 462, for knowingly and wilfully refusing to report for and submit to induction into the armed forces of the United States. Clay's draft case has been through practically every phase of selective service procedure, beginning with the date he registered on April 18, 1960, until he was ordered to report but declined to submit to induction on April 28, 1967, and was thereafter convicted by jury trial held on June 19, 20, 1967. On four different occasions he was classified 1–A (Available for military service) by his local board, twice by two different appeal boards (in Kentucky and Texas) and once by the National Selective Service Appeal Board (the Presidential Appeal Board). In every instance the vote of the boards was unanimous.

"There has been no administrative process which Clay (Ali) has not sought within the Selective Service System, its local and appeal boards, the Presidential Appeal Board and finally the federal courts, in an unsuccessful attempt to evade and escape from military service of his country. Being entirely satisfied that he has been fairly accorded due process of law, and without discrimination, we affirm his conviction."

Reviewing the claimed right to a ministerial exemption (pp. 915–918), the appellate Court noted the long course of Muhammad Ali's self-description, to the draft board and elsewhere, as a "professional fighter" and "boxer," observing that the claim to a minister's exemption followed only after the "eventful and important" change of his classification from 1–Y to 1–A and that "Clay (Ali) had never stated to his board or claimed to be a minister or a conscientious objector prior to that time" (p. 917). The Court concluded that the board had correctly denied the exemption. "His vocation is clearly that of a professional boxer." (p. 918).

The Court of Appeals likewise reviewed at some length (pp. 918–921) the claim to conscientious objector status and found it to have been properly denied upon "more than adequate evidence" (p. 921).

On March 24, 1969, the Supreme Court, vacated the judgment in Clay, aka Ali v. United States, along with a number of others, and remanded for consideration under Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), as to whether the conviction was tainted by use of the fruits of unlawful electronic surveillance. See Giordano v. United States, 394 U.S. 310 n*, 89 S.Ct.

1164, 22 L.Ed.2d 297. On July 14, 1969, after a hearing pursuant to that mandate, the District Court for the Southern District of Texas ruled that the conviction had been proper and again imposed a five-year sentence. An appeal from that decision is pending.

Throughout the criminal proceedings begun in the spring of 1967, Ali has been free on bail, and he remains in that status at this time.

In the present lawsuit, begun some four months after reaffirmance of his conviction by the Texas District Court, Muhammad Ali charges that the New York State Athletic Commission has transgressed various provisions of the Federal Constitution in holding that his conviction and sentence for refusal to serve in the armed forces justify refusal of a license to fight in the prize ring. The facts generating his present claims are said by both sides to be undisputed. They are the subjects now of a motion by plaintiff for a preliminary injunction and a motion by defendants to dismiss.

### II.

The defendants suspended plaintiff's boxing license some 2½ years ago, on April 28, 1967, when he refused to submit to induction. On June 9, 1967, concluding a short course of correspondence on the subject, the Commission stated to plaintiff's counsel that it would grant a "permissive hearing to be held within a reasonable time after" the trial and decision in the criminal prosecution. Plaintiff never sought a hearing upon the suspension as such, and the one-year license to which that action related lapsed at its term's end, on September 30, 1967.

Two years later, however, on September 22, 1969, plaintiff's attorney submitted an application for a new license with a letter requesting a hearing. The letter said in part: "Though he is not entitled to a hearing as a matter of right, his request is predicated upon good sportsmanship, equity and due process." In a letter dated October 16, 1969, the Commission denied the application, subject to reconsideration following reversal (if

it occurs) of the conviction from which plaintiff's appeal is pending in the Fifth Circuit. In its letter announcing this action, the agency stated that there was no occasion now for holding a concededly non-mandatory hearing since there were no open questions about the facts it deemed material. After summarizing the steps in the criminal proceeding, the letter to plaintiff went on to say:

"The Commission has carefully reviewed your application and has considered the entire record of your conviction of a felony in the Federal Courts for knowingly and wilfully refusing to report for and submit to induction into the armed forces of the United States. Your draft case has been through every phase of Selective Service procedure, beginning with the date you registered on April 18, 1960, until you were ordered to report and declined to submit to induction on April 28, 1967 and thereafter convicted by jury trial held on June 19, 20, 1967.

"The Commission has the power and the duty to inquire into the conduct of those who hold or apply for licenses. Your refusal to enter the service and your conviction in violation of Federal Law is regarded by this Commission to be detrimental to the best interests of boxing, or to the public interest, convenience or necessity.

"After weighing all factors in your case, the Commission unanimously voted to deny your application for a boxer's license. It should be noted that the Commission's determination is only effective in the State of New York and has no extraterritorial coverage and is not conclusive upon other States or jurisdictions. However, should your conviction be reversed by the Courts and should you re-apply for a license, we shall be more than pleased to reconsider this determination."

Exhibiting a preference shared with landlords and "a great variety" of other litigants, Eisen v. Eastman, 421 F.2d 560, 561 (2d Cir. 1969), plaintiff

chose then to come here rather than pursue the possibly ampler remedies available to him under Article 78 of New York's Civil Practice Law and Rules (see note 4, *infra*). His primary contentions—and the only ones with either a measure of substance or a solid basis for federal jurisdiction—are charges that the Commission and its members have violated 42 U.S.C. § 1983.[1] Invoking the jurisdiction for such matters given by 28 U.S.C. § 1343(3),[2] plaintiff contends that the denial of his license application

(1) violates the Due Process Clause because there is no rational basis for the action;

(2) further denies due process and constitutes cruel and unusual punishment because it has been accomplished "without * * * any of the procedural safeguards surrounding sentencing at criminal trial * * *;" and

(3) "unreasonably burdens the free exercise of plaintiff's religion without compelling justification." [3]

Plaintiff also presents an alternative claim invoking (complaint, par. 19) "the jurisdiction of this Court under both 28 U.S.C. § 1332(a) and the doctrine of pendente [*sic*] jurisdiction on the ground that defendants' refusal to renew plaintiff's boxer's license is an abuse of discretion, is not supported by competent evidence, and in addition violates defendants' statutory authority pursuant to Title 25 of the Unconsolidated Laws of New York." This theory adds little to plaintiff's otherwise full papers and will warrant comparably economical treatment here.

■ As to the relatively substantial claims under 42 U.S.C. § 1983, the court initially entertained some doubts as to its jurisdiction. It would appear, however, that the question is sufficiently answered for us in plaintiff's favor by Eisen v. Eastman, *supra*, 421 F.2d at

1. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

2. Namely, the jurisdiction "[t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States * * *."

3. Plaintiff's papers also refer here and there to the Equal Protection Clause, but there is nothing of present consequence in that. The complaint makes equal protection sounds when it alleges, par. 18 (E), "[o]n information and belief, [that] defendants have on several occasions licensed professional boxers notwithstanding evidence that such individuals would be far more likely to be detrimental to the interests of boxing than plaintiff." But this bland assertion, for which no specific basis or trace of documentation is tendered, is fairly to be ignored as weightless. Otherwise, any rejected applicant for a license, whether to cut hair or run a railroad, could pose ostensibly triable issues by comparable claims of unspecified "discrimination." Granting the broad liberality with which federal pleadings are construed, even when drafted by such sophisticated counsel as those who appear for plaintiff, an airy generality like the one quoted passes the limits. Both sides proceed upon affidavits, so that defendants' motion to dismiss may be deemed a motion for summary judgment. Fed.R. Civ.P. 12(c). Plaintiff's counsel has had ample opportunity to supply some semblance of content for the conclusory allegations, but nothing has been done along this line. Furthermore, the scholarly briefs for plaintiff, which are not terse, contain nothing at all about this subject —highlighting the strong appearance that this aspect of the complaint is casual and unsubstantial.

These considerations weigh powerfully toward a conclusion that the subparagraph in question should be ignored for all purposes. Out of what may be excessive caution, however, the court will grant leave to replead the broad allegation so that plaintiff may attempt, if he responsibly deems it possible, to supply some concrete and specific content for his charge.

562. We proceed, therefore, to the merits.

### III.

■ The visibly barbaric aspects of prize fighting, together with only slightly concealed vices of other kinds, led New York and other States to ban the activity altogether during long periods of modern history. See Rosensweig v. State, 5 N.Y.2d 404, 409, 185 N.Y.S.2d 521, 524, 158 N.E.2d 229, 231 (1959). For some time, however, relaxing its scarcely questionable power of total prohibition, New York, again like other States, has permitted the so-called sport, but subjected it to sweeping and rigorous controls administered by a State Athletic Commission. See N.Y.Unconsol. Laws, Tit. 25, § 8901 *et seq.* It is much too late in our constitutional history to dwell long upon the obviously sweeping powers of the State to regulate an activity of this kind. Cf. Goesaert v. Cleary, 335 U.S. 464, 69 S.Ct. 198, 93 L.Ed. 163 (1948); Kotch v. Board of River Port Pilot Comm'rs, 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093 (1947). The scope of occupational licensing and supervision must vary, of course, with the nature of the business and its impacts. See, e. g., Kotch v. Board of River Port Pilot Comm'rs, *supra* at 564, 67 S.Ct. 910; Dent v. West Virginia, 129 U.S. 114, 122, 9 S.Ct. 231, 32 L.Ed. 623 (1889). Whether the variations be deemed differences of kind or merely "of degree," Barsky v. Board of Regents, 347 U.S. 442, 473, 74 S.Ct. 650, 98 L.Ed. 829 (1954) (Douglas, J., dissenting), it is plain that some fields, including the one before us, are subject to broad powers for the determination and application of state policy judgments.

■ The peculiar mix of mystique and big business characterizing the world of professional sports is nowhere more complex and bemusing than in the "boxing game." See Fitzsimmons v. New York State Athletic Commission, 15 Misc.2d 831, 833, 146 N.Y.S. 117, 119 (N.Y.Co.), aff'd, 162 App.Div. 904, 147 N.Y.S. 1111 (1st Dept. 1914). Even judges have some awareness of the brutal, corrupt and dirty chapters in the history of this subject. See, *id.*, 15 Misc. 2d at 835, 146 N.Y.S. at 122; London Sporting Club v. Helfand, 3 Misc.2d 431, 436, 152 N.Y.S.2d 819, 824 (N.Y.Co. 1956), aff'd, 6 A.D.2d 775, 175 N.Y.S.2d 152 (1st Dept. 1958). On the other hand, the blood, sweat and smoke of the fight arena have been the ingredients for producing folk heroes, enshrined as models for the young as well as shrewd investments for others. All such diverse things are reflected in the broad mandate of the Athletic Commission—which is required to watch out for "fixes," for sharp managerial practices and for other corrupt devices while it strives to follow the loftier and still cherished ideals of a simpler age reflected in the notion of a "clean sport." See London Sporting Club v. Helfand, *supra*, 3 Misc.2d at 436, 152 N.Y.S.2d at 824. To implement its various objectives, the Commission is entitled to wide freedom both for expert technical controls and for more romantic, even "mid-Victorian" judgments of moral, quasi-aesthetic value. Cf. Calzadilla v. Dooley, 29 A.D.2d 152, 157, 286 N.Y.S. 2d 510, 516 (4th Dept. 1968).

■ Of course, the Commission's powers may not be employed to effect invidious discriminations based upon race, religion "or any other reason having no rational relation to the regulated activities." Kotch v. Board of River Port Pilot Comm'rs, *supra*, 330 U.S. at 556, 67 S.Ct. at 912; Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957). And plaintiff's main argument is that this basic principle has been violated in his case. While he embellishes the thought with some strained and essentially frivolous effort to make this a free-exercise-of-religion case (see IV, *infra*), the gravamen of his theory is that a conviction for draft evasion (and five-year sentence therefor) is so utterly irrelevant to the Athletic Commission's proper domain that he was denied due process when this was made the basis for rejecting his license application.

■ The argument fails. The State Commission, as is unquestionably common in this area, has express statutory power to make a felony conviction grounds for refusing, suspending or revoking a license. N.Y.Unconsol.Laws, Tit. 25, § 8917(b). The Commission was well within the bounds of rationality when it concluded that the conviction and five-year sentence in this case justified refusal of the 1969 application. Similar judgments about the significance of felony convictions are commonplace—in areas ranging from denial of the franchise and the right of jury service to denial of licenses to practice medicine. E. g., De Veau v. Braisted, 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960); Hawker v. New York, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898); Green v. Board of Elections of City of New York, 380 F.2d 445 (2d Cir. 1967), cert. denied, 389 U.S. 1048, 88 S.Ct. 768, 19 L.Ed.2d 840 (1968). Given the spectrum of their concerns, the defendant Commissioners cannot be said to have been arbitrary or outside the bounds of reason when they concluded that plaintiff's conviction and sentence should be deemed disqualifying. Cf. Green v. Board of Elections of City of New York, *supra,* 380 F.2d at 452 n. 8. As a general proposition, where "good character" is in question, it might be possible to say that any offense serious enough to carry a five-year sentence would be disqualifying notwithstanding our knowledge that such a principle could ground dubious or erroneous judgments in some cases. Cf. Hawker v. New York, *supra,* 170 U.S. at 196–198, 18 S.Ct. 573. Where the Commission must weigh subtle questions as to reliability (and whether or not we would weigh them in the same fashion ourselves), it is within its province to conclude that a breach of legal duty in the face of sanctions so serious is a bar to licensure.

More specifically, the State Commission would not be arbitrary or capricious if it deemed a crime like plaintiff's relevant in its nature to the notions of sporting men and "clean sport." This is hardly the first occasion, or a unique one, for the consideration by public officials of sentiments which may seem somewhat poetical, see Kotch v. Board of River Port Pilot Comm'rs, *supra,* 330 U.S. at 563, 67 S.Ct. 910, or may reflect standards short of the most advanced "sociological insight," Goesaert v. Cleary, *supra,* 335 U.S. at 466, 69 S.Ct. 198. As the cited cases reflect, the Federal Constitution cannot be thought to outlaw such sentiments as factors for judgment, at least where, as here, there is no suggestion that forbidden grounds of an invidious nature underlie the regulatory decision.

■ Finally, the five-year sentence imposed upon plaintiff is itself a reality of major proportions for defendants' concerns. Among its regulations the Commission has a requirement that a champion stand ready to defend his title at intervals no greater than six months. 19 N.Y.Codes, Rules and Regs. § 218.1. As plaintiff stresses, this obligation, applicable to him in the past, is a matter of prospective significance as well. Defendants were scarcely irrational in counting the prospect of a long prison term as a ground of disqualification.[4]

4. This particular point is made by the Attorney General on defendants' behalf. It was not given specifically by the Commission in the statement to plaintiff of its determination. What the Commission did do was to state to plaintiff in its letter of denial dated October 16, 1969, that it had reviewed his application and "considered the entire record of [his] conviction * * *." Upon this basis, the agency reported, it had determined that plaintiff's refusal to enter the military service and his resulting conviction were to be regarded as "detrimental to the best interests of boxing, or to the public interest, convenience or necessity. After weighing all the factors in [his] case," it went on, "the Commission unanimously voted to deny [his] application for a boxer's license." These broad statements may not serve to state the specific justifications urged by the Attorney General here in defense of the agency's decision. It is arguable that if we sat now in review of a federal agency, the principle of S.E.C. v. Chenery Corp., 318 U.S. 80, 63

## IV.

■ The argument that defendants' refusal of a license for him to fight impedes plaintiff's freedom of religion is not interesting or intelligible enough for long discussion. Plaintiff's counsel wisely refrains from proposing that the State Athletic Commission should adjudicate *de novo* on his rejected claim that he was entitled to be exempted from military service as a minister or a conscientious objector. But he argues as if the claim were somehow to be deemed still intact despite the fact that its repeated denial has been critical among the steps leading to the imposition of a long federal prison sentence. The short answer is that in this area, as in others where felony convictions are grounds for disqualification, the regulatory agency is not required to relitigate the unsuccessful defenses. See, e. g., Hawker v. New York, *supra,* 170 U.S. at 197–198, 18 S.Ct. 573. If, as has been held (thus far at least) by the responsible federal administrative and judicial agencies, plaintiff's religious claims were insufficient even to avoid criminal conviction, there is nothing to the point that the consequent denial of a license to fight offends against the First Amendment.

## V.

■ Plaintiff also invokes the Eighth Amendment, arguing that the license denial inflicts "cruel and unusual punishment." Again, a short answer seems enough. On grounds adequately and authoritatively developed elsewhere, the point fails because the action in question was not "punishment" in any relevant constitutional sense. Hawker v. New York, *supra,* 170 U.S. at 200, 18 S.Ct. 573; Green v. Board of Elections of City of New York, *supra,* 380 F.2d at 450.

There is an offhanded reference in the complaint, par. 18(C), not elaborated in the extensive motion papers, to denial "of the procedural safeguards surrounding sentencing at criminal trial," and this is in form linked to the claim of cruel and unusual punishment. However, as plaintiff's counsel repeatedly acknowledges, there were and are no disputed facts calling for any "procedural safeguards" of any relevant sort. And plaintiff wisely refrains from pursuing the fantasy that the Commission was required literally to use the procedures of criminal cases to determine whether he should be licensed to box.

---

S.Ct. 454, 87 L.Ed. 626 (1943), would preclude affirmance of the administrative action upon a ground not taken, or at least not articulated, by the officials in charge. It is possible, too, that a *state* court reviewing the action in question might refer the matter back to ascertain how far the rationale first stated in court could fairly be deemed to account for the contested agency ruling. Cf. Barry v. O'Connell, 303 N.Y. 46, 100 N.E.2d 127 (1951); Golisano v. Town Board of Town of Macedon, 31 A.D.2d 85, 87–88, 296 N.Y.S.2d 623, 626 (4th Dept. 1968); Blum v. D'Angelo, 15 A.D.2d 909, 910, 225 N.Y.S.2d 894, 895 (1st Dept. 1962). But it has not been supposed that the *Chenery* doctrine, however salutary, relates to any constitutional principles applicable in a case like the one here. For the federal court the questioned state ac-

tion is suitably defended by any responsible official authorized to come here and make the defense. Cf. Erie R. R. Co. v. Public Utility Comm'rs., 254 U.S. 394, 413, 41 S.Ct. 169, 65 L.Ed. 322 (1921); Phyle v. Duffy, 334 U.S. 431, 440–441, 68 S.Ct. 1131, 92 L.Ed. 1494 (1948); Marino v. Ragen, 332 U.S. 561, 68 S.Ct. 240, 92 L.Ed. 170 (1947); Dreyer v. Illinois, 187 U.S. 71, 83–84, 23 S.Ct. 28, 47 L.Ed. 79 (1902); Barsky v. Board of Regents, 347 U.S. 442, 469–470, 74 S.Ct. 650, 98 L.Ed. 829 (1954) (Frankfurter, J., dissenting). This may suggest that there are advantages in seeking, at least in the first instance, state judicial review of state agency action. Cf. Fox v. Standard Oil Co., 294 U.S. 87, 96–97, 55 S.Ct. 333, 79 L.Ed. 780 (1935).

## VI.

A final brief subject is the alternative proposal that this court, under the diversity (or pendent) jurisdiction, should appraise the rationality and "legality" of the Commissioners' decision, as well as the sufficiency of the evidence, as if we were a state court under N.Y. CPLR Art. 78. It is a matter for doubt whether this species of state jurisdiction, which the New York Legislature has carefully distributed between its Supreme Court at Special Term and the multi-judge Appellate Division (see CPLR § 7804), could properly be exercised by the federal court in any case. Cf. Chicago, R.I. & P.R.R. v. Stude, 346 U.S. 574, 580–582, 74 S.Ct. 290, 98 L.Ed. 317 (1954). We would suppose, if the question were important, that this case as proposed under the diversity or pendent jurisdiction remains at best a clear occasion for abstention by the federal court. Alabama Public Service Comm'n. v. Southern R. Co., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951); Burford v. Sun Oil Co., 319 U.S. 315, 325–334, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 424, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964) (Douglas, J., concurring).

But the simplest answer is that the alternative jurisdictional theory leads to *nothing additional* on the merits. For the reasons stated earlier, the Commission's decision is neither irrational nor unsupported by evidence nor otherwise assailable.[5]

Plaintiff's motion for a preliminary injunction is denied. Defendants' motion to dismiss is granted, but with leave to plaintiff to replead in the respect discussed earlier (note 3, *supra*).

It is so ordered.

---

5. A theoretically possible flaw in this conclusion may be the problem of the agency's stated rationale, considered in note 4, *supra*. Without undue lengthening of footnote speculations, this court opines that, on the particular facts of this case, the point would not help plaintiff in a state court.