OPINION OF THE COURT
Albert A. Blinder, J.
On November 23, 1979, Willie "Macho” Classen, a professional prizefighter, was knocked out by one Wilfred Scypion in the tenth round of a boxing "exhibition”[2] held in the Felt Forum at Madison Square Garden. Five days later, Classen died as a result of a subdural hematoma.
*347 Classen’s wife, the claimant-administratrix herein, seeks damages for the alleged negligence and medical malpractice of various persons whom she claims were employees of the defendant.
At trial, bifurcation was ordered. Thus, this decision addresses only the issue of liability.
Willie Classen began his professional boxing career in February of 1973. Fighting as a middleweight, his over-all record in New York was 14 wins, 6 losses and 1 draw. While winning seven of his fights by either a knockout or a technical knockout, Classen lost only two by a knockout or technical knockout. In addition, the deceased fought at least three opponents in matches held in New Jersey, Italy and England.
In April of 1979, Classen fought one Johnny Locicero and was knocked out in the eighth round. He was indefinitely suspended by the New York State Athletic Commission (hereinafter SAC), with a requirement that he undergo an electroencephalogram (hereinafter EEC) before being reinstated. While under suspension, Classen continued training and sparring.
Although still under suspension, Classen fought a boxer named Tony Sibson, in London, on October 9, 1979. The planning for this contest and the fight itself were conducted without the knowledge of the SAC. During the fight Classen was knocked down in the first round but regained his feet at the count of 3 or 4. He complained of double vision to his manager, between rounds, but decided to continue. After being knocked down twice more in the second round, the referee stopped the fight.[3]
Upon his return to the United States, Classen informed several of the officials of the SAC of his bout with Sibson, but did not tell them of the knockdowns. He advised Deputy Commissioner Marvin Kohn that the bout had been stopped because of cuts to his face.
On November 13, 1979, Classen was given an EEC at the SAC office by a licensed technician. The results were forwarded to a specialist at Beekman Downtown Hospital, Dr. Milton Tarlau. He interpreted the results of the EEC as being within normal limits.
*348 Subsequently, on November 20, 1979, Classen underwent a physical examination by Edwin A. Campbell, the Medical Director of the SAC. Dr. Campbell found Classen in excellent physical condition. As a result, Classen was given a permit to engage in prizefighting pending issuance of a new license.
The November 23, 1979 fight against Scypion, one of several contests scheduled for the Felt Forum at Madison Square Garden that evening, was uneventful until Classen was knocked down in the third round. Classen rose by the count of four and was given the mandatory standing eight count. During the middle rounds Classen appeared to rally. However, in the ninth round, he was given another standing eight count after a number of blows to the head propelled him into the ropes.
At the conclusion of the ninth round, Dr. Richard Izquierdo and Dr. Roger Warner entered the ring to examine Classen. Dr. Izquierdo questioned Classen, using both English and Spanish, as to whether he wanted to continue the fight and whether he could finish. Classen responded affirmatively to both queries. Dr. Izquierdo testified that he observed Classen’s pupils, as he asked him several questions to test his memory. The bout was allowed to continue.
As the tenth round began, Scypion moved quickly across the ring and delivered two blows, sharply, to Classen’s head driving Classen’s upper body through the ropes.
Both doctors responded immediately. After lowering Classen to the apron of the ring, the doctors began examining him. Dr. Warner asked Classen to squeeze his right hand and then his left. Classen informed Dr. Izquierdo that he could not squeeze his left hand. It was Dr. Izquierdo’s impression, at that point, that Classen had suffered some neurological damage.
After one of the doctors asked one of the other persons standing nearby to summon an ambulance, Classen was removed, by stretcher, to the hallway between the dressing room and the ring. Both doctors continued to provide medical treatment until the ambulance arrived. Classen was taken to Bellevue Hospital Center. Although vigorous medical and surgical treatment were administered, including a "burr hole” craniotomy, Classen died on November 28, 1979.
Since the State of New York is the only defendant in this case, the court finds it necessary, preliminarily, to examine several legal issues. Only if these issues are resolved in claimant’s favor will the court address all the factual conten *349 tions and relative culpability, if any, of the individuals involved.
The legal issues overshadowing this entire trial were raised by the Court of Appeals in Rosensweig v State of New York (5 NY2d 404). In that case, another prizefighter, George Flores died several days after receiving two very severe blows to the head in a bout held in Madison Square Garden, on August 29, 1951. The claim of negligence against the defendant was based on the theory that Flores did not die from the blows received in that fight. Rather, the trial court held that there was an aggravation of a brain injury, received in a previous bout, which went undetected by doctors who found him physically fit to fight. The Court of Appeals, rather than addressing the issue of negligence, found (4 to 3) that the doctors were not agents or employees of the defendant, State of New York, and, therefore, no suit could be maintained against it. The court, in its decision, stated:
"To be sure, the corporation promoting the contest was required to employ for this purpose a physician included on the [State established] panel * * * No one would seriously suggest that every person to whom the State has issued a license to practice his profession or trade thereby becomes an employee or agent of the State. Nor is such a relationship created by virtue of the fact that the State may also prescribe the amount of the fee to be charged; regulation, no matter how close or stringent, is not thereby transmuted into government operation * * *
"It is difficult to conceive that the Legislature, in enacting the statute, ever considered the possibility that these doctors could be deemed servants of the State for whose negligence it would be held responsible. Precisely similar requirements are imposed for referees and judges whose fees are likewise prescribed by the commission * * * and yet it could hardly be claimed that the State would be answerable in damages if, for instance, a referee negligently failed to terminate a bout.” (5 NY2d, at pp 411-412.)
The practices at the SAC have undergone some modification in the years following the Flores fight. While it was noted in the dissent in Rosensweig (5 NY2d, at p 415), that, "[w]hile, ostensibly, the corporation had a choice, in practice, it worked out that the examinations were invariably made by the same physicians”, it is now the Medical Director who designates the ringside physician from the approved group of panel physi *350 cians.[4] In addition, the statute regarding the method of payment of fees to the ringside physicians (McKinney’s Uncons Laws of NY § 8926 [L 1920, ch 912, § 26]) was amended by Laws of 1955 (§ 1). Originally, the promoting corporation paid the attending ringside physicians directly. The amendment mandated that the promoting corporation pay the fees to the SAC which, in turn, would then pay the physicians.
We find the fact that the Medical Director now designated the physicians to be an insignificant change in procedure and, in any event, an effort at tighter regulation rather than a design to make the physicians employees of the defendant. It certainly does not change the facts of this case sufficiently to cast doubt on the applicability of the holding in Rosensweig (supra).
In an attempt to discover the legislative intent behind the amendment to Unconsolidated Laws § 8926 we have carefully examined the "bill jacket” regarding Laws of 1955 (ch 546). The sparse documentation indicates a twofold purpose for this legislation. In a letter dated March 30, 1955 to the Executive Chamber, the then Chairman of the SAC, Julius Helfand, stated in part,
"Although we designate from our panel of physicians, those doctors that are to be permitted to officiate at ringside, we have no other control of these physicians. Their responsibility, therefore, is not to us but to their employers. We have experienced incidents where doctors have been questioned with respect to some action they have taken at ringside, and they have taken the position that their responsibility was to the promoting club and not to the Commission.
"Presently, having the power to designate the doctors, we now desire also to pay the doctors directly from funds which will be contributed by the various promoting clubs.”
Another document in the bill jacket is a letter from the State Comptroller’s office to then Governor Averell Harriman.
In addition to summarizing the contents of the chapter amendment, the letter contains the following paragraph: "There would seem to be no objection in permitting the Commission to have this control over the fees. At least there would be assurance that the physicians would be compensated for their services.”
*351 There are no other letters or reports. Based on the comments quoted above, this court cannot discern any change in law or procedure which would indicate a design on the part of the defendant’s agencies to establish an employer-employee relationship with the physicians approved by the Medical Advisory Board to be members of the panel. Rather, the clear intent of this legislation appears to be regulatory in nature.
A number of cases, in addition to Rosensweig (supra) have noted the broad powers of the SAC to regulate and strictly supervise the sports of boxing and wrestling. (See, e.g., Matter of Calzadilla v Dooley, 29 AD2d 152; Matter of Griffith v Krulewitch, 51 Misc 2d 352; Matter of Tilelli v Christenberry, 1 Misc 2d 139.) In performing these functions, the SAC must be accorded a "great deal of latitude and discretion” (Matter of London Sporting Club v Helfand, 3 Misc 2d 431, 436). Thus, this court concludes that it is constrained by the continuing vitality of the holding in Rosensweig (supra) and finds that the panel physicians at the Classen-Scypion bout were not employees of the defendant.
This court’s analysis of the relationship between the State of New York and the panel physicians is also applicable in determining the responsibility of the defendant for the actions of Lou Eskin, the referee at the subject prizefight. In view of our findings regarding the panel physicians, we must also rule, without reaching the question of negligence, that the referee was not an employee of the defendant. We note that the passages of the opinion in Rosensweig (supra) which have been quoted herein, contain explicit language, albeit dictum, supporting this position. Nothing in the rules of the SAC or the applicable statute in force at the time of the decedent’s last bout would cause us to abandon this reasoning.[5]
As an alternate theory of liability, claimant seeks to hold *352 defendant liable for the actions of employees of the SAC in permitting the deceased to fight on November 23, 1979. One of their arguments under this theory is that Classen was medically unfit at the time of his physical examination on November 20, 1979; that the Medical Director of the SAC should have known this fact and/or failed to conduct a thorough physical examination.
Dr. Edwin A. Campbell became the Medical Director of the SAC in June 1979. A graduate of New York Medical College in 1952, Dr. Campbell served an internship at St. Mary’s Hospital in Philadelphia from 1952 to 1953. Thereafter, he was a surgical resident at Brooklyn Veteran’s Hospital and Coney Island General Hospital. From 1955 until 1958, Dr. Campbell served as a senior, and then chief resident, at Harlem Hospital.
While in practice, Dr. Campbell testified that he specialized in general and traumatic surgery and continues as an Assistant Professor in sports medicine at New York Medical College.
Prior to his education as a physician, beginning from the age of 11, Dr. Campbell was an amateur boxer, sanctioned under the Amateur Union Rules and Regulations. In addition, he boxed in both Italy and North Africa. Subsequent to his medical training, Dr. Campbell retained his interest in boxing by attending training camps for boxers, as a volunteer, and advising them on physical fitness. In 1959, he was approved as a panel physician with the SAC.
As noted previously, Classen was suspended, indefinitely, after the April 1979 Locicero fight with the requirement that he undergo an EEG before reinstatement. On November 13, 1979, Classen was administered an EEG at the SAC’s office and the results were reported by an outside medical expert as "normal”.
On November 20, 1979, Dr. Campbell conducted an extensive physical and neurological examination of Classen. In the "Statement of Applicant” portion of the "History and Physical Examination-Record for License” form used on that date, Classen answered "no” to a series of questions including whether he was ever knocked out, ever knocked unconscious or whether he suffered from headaches or blurred or defective vision.
As a result of the examination, Dr. Campbell approved Classen for boxing.
*353 Claimant produced Dr. Jay Rosenblum, a physician active in the field of neurology. A graduate of Wake Forest Medical School, Dr. Rosenblum served his internship at Albany Medical Center and his residency at Jefferson Medical College. He was licensed to practice in New York in 1965. In addition to affiliation with several hospitals in Manhattan, Dr. Rosenblum was an instructor in neurology at New York Medical College and Mount Sinai School of Medicine. He also held an appointment as an assistant clinical professor of neurology at New York University School of Medicine.
Dr. Rosenblum opined regarding the cause of Classen’s death and the injuries the boxer received in the ninth round of the fatal fight. He also testified that some brain damage will not be exhibited on an EEC. The following exchange took place between claimant’s attorney and the expert:
"Q. In 1979, were there any diagnostic tools that were helpful or more informative in your expert opinion? * * *
"A. ’79, certain CT scanning was around, or the CAT scan, that certainly would be helpful.”
The court finds, on this branch of claimant’s case, that there is insufficient evidence to indicate that Dr. Campbell did not conduct a complete and thorough examination of Classen nor that a CAT scan should have been ordered, in addition to the EEC which was performed. Nothing in the record persuades the court that Dr. Campbell did anything less than follow accepted procedures at the time in arriving at his decision to allow Classen to box again.
Arguendo, even if we were to find that the lapse of 45 days, between the London fight and the fatal contest, was an inadequate period of recuperation, as Dr. Rosenblum maintained, there can be no legal basis for the finding of liability.
The following testimony was elicited during Dr. Rosenblum’s cross-examination by defendant’s counsel:
"Q. My question Doctor is, whether that determination as to what is enough of a rest period after the fighter has been knocked out, entails the exercise of medical judgment by the doctor?
"The court: 'Is that correct?’
"Q. Is that correct?
"A. What?
"Q. The determination as to the length of rest period.
"A. Depends on the physician.
*354 "Q. Depends on his medical judgment?
"A. Whoever is making that medical judgment?
"Q. Yes, sir.
"A. I would assume so, yes sir.”
Thus, the medical determination that Classen had sufficiently rested before the Scypion fight cannot be challenged. (St George v State of New York, 283 App Div 245, affd 308 NY 681.)[6]
Finally, we reach the question of whether Commission personnel, notably Deputy Commissioner Marvin Kohn, were under a duty to notify the British Boxing Board of Control of Classen’s suspension or to investigate the actual circumstances of the London bout, rather than rely on the statements of Classen regarding the outcome.
Mr. Kohn testified that the British Boxing Board of Control, "is the regulatory body in Great Britain. But it is not govern-mentally instituted. It is a regulatory body which would be similar to a jockey club. It has always been there. It is not funded by the government as our New York — United States commissions.” Therefore, he indicated there was no formal exchange of information with the British Board. Mr. Kohn described how suspension bulletins, such as the one issued after Classen’s fight with Locicero, were distributed to the promoters, matchmakers, media and other commissions with which the SAC had a "working relationship”.
There is no proof in the record that the British Boxing Board of Control ever received a copy of the suspension bulletin concerning Classen. Moreover, there is nothing contained in the record indicating any rule, requirement, procedure or custom which the court could construe as a duty for the SAC to notify the British Board or, more importantly, that the failure to do so was a proximate cause of Classen’s death.
With the same rationale, claimant also seeks to fasten liability on the SAC’s failure to ascertain the actual results of the London fight, rather than relying solely on the representations made by Classen that it was "stopped on a cut”.
Again, claimant cannot refer to any specific duty which mandated an independent investigation of the London fight. In reviewing the jurisdiction and powers of the SAC we must begin with McKinney’s Unconsolidated Laws of NY § 8906 (L *355 1920, eh 912, § 6, as amended through L 1953, eh 137, § 1) which provides:
"Jurisdiction of commission.
"The commission shall have and hereby is vested with the sole direction, management, control and jurisdiction over all such boxing, sparring and wrestling matches or exhibitions, professional as well as amateur, to be conducted, held or given within the state of New York. The commission is hereby given the sole control, authority and jurisdiction over all licenses to hold boxing, sparring or wrestling matches or exhibitions for prizes or purses or where an admission fee is received, and over all licenses to any and all persons who participate in such boxing, sparring or wrestling matches or exhibitions, as hereinafter provided.”
As we have noted previously, the SAC is accorded a great deal of latitude and discretion in the performance of its duties. (See, Matter of London Sporting Club v Helfand, 3 Misc 2d 431, supra.) As with any governmental function, certain activities are still clothed with sovereign immunity as long as those activities are not deemed to be ministerial, rather than discretionary, in nature. In making this determination we find the following passage from the Court of Appeals opinion in Southworth v State of New York (47 NY2d 874, 876) to be instructive: "This determination, however, should not be read as suggesting that the State might have been liable if the Motor Vehicle Department had been negligent in issuing the license. Statutes and regulations adopted in the exercise of the police power are, of course, designed to protect the general public from certain known or anticipated harms. But it is settled that the State and its subdivisions acting 'for the protection of the general public, cannot be cast in damages for a mere failure to furnish adequate protection to a particular individual to whom it assumed no special duty’ (Evers v Westerberg, 38 AD2d 751, affd 32 NY2d 684). It would seem that this principle should apply to the administration and enforcement of State licensing requirements. We also note that when State officials negligently issue a license or fail to revoke it, the State action is generally held not to be the proximate cause of the injury inflicted by the licensee (see State’s Liability for Improperly Licensing Negligent Drivers, Ann., 79 ALR3d, 955).”
Examination of the aforementioned statute leads us to the inescapable conclusion that the Deputy Commissioner’s ac *356 tions, regarding the London fight and Classen’s subsequent prizefight, represent policy determinations to which immunity attaches. The language of the statute makes it clear that the direction, management, control, authority and jurisdiction which the SAC has over boxing is exclusive. Vested with these powers, the decision to license an individual to fight, and the steps that are taken to arrive at that decision, must be regarded as the exercise of discretionary power to which no liability can attach.[7]
In making these determinations, we specifically do not pass on any factual issues unless noted, including the possible culpability of claimant’s decedent under CPLR article 14-A. (See, e.g., Maddox v City of New York, 66 NY2d 270.)
While sympathetic to the plight of decedent’s family, we cannot attach liability to this defendant where there is no legal or factual basis for doing so.
It is not this court’s province to comment on the alleged "legal savagery”[8] of boxing "exhibitions” in this State and elsewhere. The permissibility and regulation of boxing are legislative functions. We merely ponder the public policy considerations in allowing a sport to continue wherein it is estimated that "[e]ighty-seven percent of the professional boxers had definite evidence of brain damage.”[9]
All motions at trial, upon which decision was reserved and not herein granted, are now denied.
The claim is dismissed.[10]

. In the jargon employed by the New York State Athletic Commission, a prizefight is referred to as an "exhibition” and the total of exhibitions on a particular night as a "show”.

. Sometime after the death of decedent, for the first time, did the SAC receive a detailed, unsolicited report from London officials as to the details of the fight.

. We can find no merit in claimant’s argument that the ringside physicians were unqualified since both satisfied the minimum requirements and were duly approved by the Medical Advisory Board.

. Our search of decisional law found only one other case in the country with similar facts. In Hart v Spectrum Arena (15 Pa Commonwealth Ct 584, 329 A2d 311), the Commonwealth Court of Pennsylvania dismissed an action against the State Athletic Commission holding that since the Commission was a department of the Commonwealth it was shrouded by the Commonwealth’s then existing protection of sovereign immunity. (See also, Liability for injury to or death of participant in game or contest, Ann., 7 ALR2d 704 [1949].) We also note this claimant cites Matter of Cunningham v Department of State, Div. of State Athletic Commn. (255 App Div 729), where a workers’ compensation award to a referee, who was injured during a wrestling bout, was upheld against the SAC. That ruling, however, was later questioned because of statutory amendments. (See, Matter of Chilk v City of New York, 26 AD2d 425, 427, affd 22 NY2d 661.)

. Moreover, the decedent never told Dr. Campbell that the "T.K.O.” in London resulted from three knockdowns in less than two rounds.

. While decisions may be reviewable under CPLR article 78, decisions that are arbitrary, capricious, not supported by substantial evidence or contrary to law, do not necessarily create causes of action against the State. (See, e.g., Carpenter v City of Plattsburgh, 105 AD2d 295, affd 66 NY2d 791.)

. Report of New Jersey State Commission of Investigation, New York Times, Dec. 12, 1985, at 1, col 2.

. Casson, Siegel, Sham, Campbell, Tarlau and DiDomenico, Brain Damage in Modern Boxers, 251 [No. 20] JAMA 2663 (May 26, 1984); see, Classen v State of New York, claim No. 63921, motion No. M-32884, filed Oct. 10, 1985, Blinder, J.

. Even if liability had been found, this court would have been constrained to dismiss the third cause of action on the grounds of untimeliness. (Asch v City of New York, 34 AD2d 778; Rios v State of New York, 67 AD2d 744; cf. Boland v State of New York, 30 NY2d 337.)