# DREYER *v.* ILLINOIS.

## ERROR TO THE SUPREME COURT OF THE STATE OF ILLINOIS.

No. 37. Argued and submitted April 18, 1902.—Decided, November 10, 1902.

Dreyer was convicted in a state court of Illinois for having failed to turn over, as required by statute, to his successor in office, certain revenues, bonds, funds, warrants and personal property, that came into his hands as Treasurer of a Board of Public Park Commissioners. The judgment of conviction was affirmed by the Supreme Court of Illinois, and the accused was sentenced to the penitentiary.

By a statute of Illinois it was provided: " When the jury retire to consider of their verdict, in any criminal case, a constable or other officer shall be sworn or affirmed to attend the jury to some private and convenient place, and to the best of his ability keep them together without meat or drink (water excepted) unless by leave of court, until they shall have agreed upon their verdict, nor suffer others to speak to them, and that when they shall have agreed upon their verdict he will return them into court." In this case the statute was not complied with, but objection on that ground was first made on a motion for new trial.

The accused in this case was sentenced to the penitentiary, and the warden was commanded to confine him in safe and secure custody, from and after the delivery thereof, " until discharged by the State Board of Pardons, as authorized and directed by law, provided such term of impris-

onment in said penitentiary shall not exceed the maximum term for the crime for which the said defendant was convicted and sentenced." The sentence was based upon a statute of Illinois, approved April 21, 1899, and known as the Indeterminate Sentence Act. By that statute it was provided: " Whenever it shall be made to appear to the satisfaction of the State Board of Pardons from the warden's, report or from other sources, that any prisoner has faithfully served the term of his parole, and the board shall be of the opinion that such prisoner can safely be trusted to be at liberty and that his final release will not be incompatible with the welfare of society, the State Board of Pardons shall have the power to cause to be entered of record in its office an order discharging such prisoner for, or on account of, his conviction, which said order, when approved by the Governor, shall operate as a complete discharge of such prisoner in the nature of a release or commutation of his sentence, to take effect immediately upon the delivery of a certified copy thereof to the prisoner, and the clerk of the court in which the prisoner was convicted shall, upon presentation of such certified copy, enter the judgment of such conviction satisfied and released pursuant to said order. It is hereby made the duty of the clerk of the Board of Pardons to send written notice of the fact to the warden of the penitentiary of the proper district whenever any prisoner on parole is finally released by said board." Laws of Ill. 1899, p. 142. *Held:*

(1) That the ruling that the objection as to non-compliance with the statute requiring the jury to be placed in charge of a sworn officer, was not made in time and was to be deemed as waived, presented no question of a Federal nature, but was an adjudication simply of a question of criminal and local law, and did not impair the constitutional guaranty that no State shall deprive any person of liberty without due process of law.

(2) The objection that the act of 1899 conferred upon executive or ministerial officers powers of a judicial nature, did not present any question under the due-process clause of the Fourteenth Amendment. Whether the legislative, executive and judicial powers of a State shall be kept altogether distinct and separate, or whether persons or collections of persons belonging to one department may, in respect to some matters, exert powers which, strictly speaking, pertain to another department of government, is for the determination of the State. And its determination one way or the other cannot be an element in the inquiry whether the due process of law prescribed by the Fourteenth Amendment has been respected by the State or its representatives when dealing with matters involving life or liberty.

(3) If the jury in a criminal cause be discharged by the court because of their being unable to agree upon a verdict, the accused, if tried a second time, cannot be said to have been put twice in jeopardy of life or limb, whether regard be had to the Fifth or the Fourteenth Amendment.

By an indictment returned in the Criminal Court of Cook County, Illinois, on the 4th day of February, 1899, the plaintiff in error Dreyer was charged with the offence of having failed to turn over to his successor in office, as treasurer of the West Chicago Park Commissioners, revenues, bonds, funds, warrants and personal property that came to his hands as such treasurer, of the value of $316,013.40 — said Commissioners constituting a Board of Public Park Commissioners appointed by the Governor and confirmed by the Senate of Illinois, and as such having the supervision of the public parks and boulevards in the town of West Chicago and authority under the law to collect and disburse moneys, bonds, etc., for their maintenance.

The indictment was based on section 215 of the Criminal Code of Illinois, which is as follows:

"If any state, county, town, municipal or other officer or person, who now is or hereafter may be authorized by law to collect, receive, safely keep or disburse any money, revenue, bonds, mortgages, coupons, bank bills, notes, warrants or dues, or other funds or securities belonging to the State, or any county, township, incorporated city, town or village, or any state institution, or any canal, turnpike, railroad, school or college fund, or the fund of any public improvement that now is or may hereafter be authorized by law to be made, or any other fund now in being or that may hereafter be established by law for public purposes or belonging to any insurance or other company or person, required or authorized by law to be placed in the keeping of any such officer or person, shall fail or refuse to pay or deliver over the same when required by law, or demand is made by his successor in office or trust, or the officer or person to whom the same should be paid or delivered over, or his agent or attorney, authorized in writing, he shall be imprisoned in the penitentiary not less than one *nor more than ten years: Provided,* Such demand need not be made when, from the absence or fault of the offender, the same cannot conveniently be made : *And provided,* That no person shall be committed to the penitentiary under this section unless the money not paid over shall amount to one hundred dollars, or if it appear that such failure or refusal is occasioned by unavoidable loss or accident. Every person con-

victed under the provisions of this section shall forever thereafter be ineligible and disqualified from holding any office of honor or profit in this State." Hurd's Revised Statutes, 1901, p. 630, § 215.

A trial was commenced on the 29th day of August, 1899, and a jury was empaneled and evidence heard. The jury not having agreed upon a verdict were discharged.

A second trial was begun on the 19th day of February, 1900. The defendant filed a plea of once in jeopardy, which in substance averred that it was not true, as recited in the order of court at the previous trial, that the jury were unable to agree upon a verdict; also, that the discharge of the jury was without the defendant's assent, was against his objections made at the time, and was without any moral or physical necessity justifying such a course on the part of the trial court.

On motion of the State, the plea of former jeopardy was stricken from the files, the defendant at the time excepting to the action of the court.

There was a second trial which resulted in the defendant being found " guilty of failure to pay over money to his successor in office, in manner and form as charged in the indictment," the jury stating in the verdict that the amount not paid over was $316,000, and imposing the punishment of confinement in the penitentiary.

The defendant upon written grounds filed moved for a new trial, and also moved in arrest of judgment. Both motions were overruled, and it was ordered and adjudged that the defendant be sentenced to the penitentiary " for the crime of failure to pay over money to his successor in office, whereof he stands convicted."

The judgment of the trial court having been affirmed by the Supreme Court of Illinois, the case is here upon writ of error allowed by the Chief Justice of that court.

*Mr. Alfred S. Austrian* for plaintiff in error. *Mr. T. A. Moran* and *Mr. Levy Mayer* were with him on the brief.

*Mr. H. J. Hamlin*, attorney general of the State of Illinois,

*Mr. Charles S. Deneen* and *Mr. A. C. Barnes* for defendants in error.

MR. JUSTICE HARLAN, after stating the facts as above reported, delivered the opinion of the court.

It is contended that the judgment of the Supreme Court of Illinois, affirming the judgment in the present case of the Criminal Court of Cook County, in that State, denied to the plaintiff in error certain rights secured to him by the Constitution of the United States, particularly by the clause of the Fourteenth Amendment forbidding a State to deprive any person of liberty without due process of law.

The defendant insists that three questions, involving rights secured by the Constitution of the United States, are presented by the assignments of error.

1. The first of those questions, as stated by his counsel, relates to the alleged " omission to swear the baliffs in the manner prescribed by the common law and the statutes of the State of Illinois before the jury retired to consider of their verdict." This point will be first examined.

The Criminal Code of Illinois provides: " When the jury retire to consider of their verdict in any criminal case, a constable or other officer shall be sworn or affirmed to attend the jury to some private and convenient place, and to the best of his ability keep them together without meat or drink (water excepted); unless by leave of the court, until they shall have agreed upon their verdict, nor suffer others to speak to them, and that when they shall have agreed upon their verdict he will return them into court: *Provided,* In cases of misdemeanor only, if the prosecutor for the people and the person on trial by himself or counsel, shall agree, which agreement shall be entered upon the minutes of the court, to dispense with the attendance of an officer upon the jury, or that the jury, when they have agreed upon their verdict, may write and seal the same, and after delivering the same to the clerk, may separate, it shall be lawful for the court to carry into effect any such agreement, and receive any such verdict so delivered to the clerk as the

lawful verdict of such jury." Hurd's Rev. Stat. Ill. 1901, p. 660, § 435.

Referring to this section the Supreme Court, in the present case, said that it was reversible error in a trial for a felony to allow the jury to retire for the purpose of considering their verdict without being placed in charge of a sworn officer as required by the statute—citing *McIntyre* v. *People*, 38 Illinois, 514, 518 ; *Lewis* v. *People*, 44 Illinois, 452, 454 ; *Sanders* v. *People*, 124 Illinois, 218, and *Farley* v. *People*, 138 Illinois, 97. In *Lewis* v. *People*, just cited, the court observed that the provisions of the above section " show the great care and solicitude of the General Assembly to secure to every person a fair and impartial trial ; and it is eminently proper, as in many cases the accused is imprisoned, and it is not in his power to protect his rights from being prejudiced by undue influences. It should ever be the care of courts of justice to guard human life and liberty against being sacrificed by public prejudice or excitement. The jury should be entirely free from all outside influences from the time they are empaneled until they return their verdict and it is accepted and they discharged ; and the legislature have determined that the provisions of this statute are necessary to accomplish the object. It is a provision easily complied with, and one member of the court, at least, has never in practice seen it dispensed with, except in cases of misdemeanor. The provisions of the statute are clear, explicit and peremptory. We know of no power short of its repeal, to dispense with this requirement."

But the court further said : " The point of controversy in the present case is not, however, whether it is reversible error to fail to comply with the statute, but whether the question is properly raised upon this record. No objection or exception was taken by the defendant, at the time of the retirement of the jury, that the officers in charge of it were not sworn, but the question was raised by him for the first time on his motion for new trial, one of the grounds of that motion being ' that when the jury retired to consider of their verdict in said case no constable or other officer was sworn or affirmed to attend the jury, in manner and form as provided by the statute of the State of Illinois.' . . . Affidavits made by the bailiffs them-

selves, and by an assistant of the prosecuting attorney, who participated in the trial, tend to prove that the oath administered was in the statutory form; but these affidavits also show that the only oath administered to them was on the 21st day of February, immediately after the empaneling and swearing of the jury. It is shown by the bill of exceptions that the trial was not concluded and the jury finally sent out until February 28th, so that even by the proof made on behalf of the people the only oath taken by the bailiffs was some six days prior to their retirement with the jury, and prior to the introduction of evidence and the subsequent steps of the trial. This cannot be held to be a compliance with the requirement of the statute that ' when the jury shall retire to consider of their verdict,' etc., ' a constable or other officer shall be sworn,' etc. To swear the bailiffs immediately upon the jury being sworn, and prior to the introduction of the evidence, the arguments of counsel and instructions of the court—six or seven days prior to the retirement of the jury to consider of their verdict—would be little less than farcical."

It was, however, held, that under the principles established by former decisions in Illinois, the requirement of the statute could be waived by the accused, and that his failure to object at the time that the officer having charge of the jury was not sworn when the jury retired was equivalent to a waiver of compliance with its provisions. And it was adjudged " that the question whether or not, upon the retirement of the jury to consider of its verdict, it was placed in charge of a constable, or other officer, sworn to attend it, as prescribed by statute, is not properly raised by the record [of this case] and therefore [is] not available as error in this court."

It thus appears that while the state court expressly recognized the rights of the accused under the statute it adjudged that he had not properly raised on the record the question raised for the first time on motion for a new trial as to noncompliance with its provisions. But manifestly this decision presents no question of a Federal nature. A ruling to the effect that the accused shall be deemed to have waived compliance with the statute if the record does not show that he

objected at the time to the action of the court, was an adjudication simply of a question of criminal practice and local law, was not in derogation of the substantial right recognized by the statute, and did not impair the constitutional guaranty that no State shall deprive any person of liberty without due process of·law.   We cannot perceive that such a decision by the highest court of the State brings the case upon this point within the Fourteenth Amendment, even if it should be assumed that the due process of law prescribed by that Amendment required that a jury in a felony case should be placed in charge of an officer especially sworn at the time to attend and keep them together until they returned their verdict or were discharged.

We adjudge that in holding that the record did not sufficiently present for consideration the question now raised, the state court, even if it erred in its decision, did not infringe any right secured to the defendant by the Constitution of the United States.

2. Another question which counsel for the defendant contends is raised by the assignments of error relates to the final judgment of the Criminal Court of Cook County.   It was adjudged by the trial court that the defendant be taken to the penitentiary of the State, at Joliet, and delivered to its warden or keeper, who was required and commanded to " confine him in said penitentiary, in safe and secure custody, from and after the delivery thereof, *until discharged by the State Board of Pardons, as authorized and directed by law, provided such term of imprisonment in said penitentiary shall not exceed the maximum term for the crime for which the said defendant was convicted and sentenced.*"

The judgment was in conformity with a statute of Illinois approved April 21, 1899, entitled " An act to revise the law in relation to the sentence and commitment of prisoners convicted of crime, and providing for a system of parole," etc.   The statute is sometimes referred to as the Indeterminate Sentence Act of Illinois, and as its validity under the Constitution of the United States is assailed its provisions must be examined.

That statute provides that every male person over twenty years of age, and every female person over eighteen years of

age, convicted of a felony or other crime punishable by imprisonment in the penitentiary, except treason, murder, rape and kidnapping, shall be sentenced to the penitentiary, the court imposing the sentence to fix its limit or duration, the term of such imprisonment not to be less than one year, nor exceeding the maximum term provided by law for the crime of which the prisoner was convicted, making allowance for good time, as provided by law. § 1.

It was made the duty of each board of penitentiary commissioners to adopt such rules concerning prisoners committed to their custody as would prevent them from returning to criminal courses, best secure their self-support, and accomplish their reformation. To that end it provided that whenever any prisoner was received into the penitentiary the warden should cause to be entered in a register the date of his admission, the name, nativity, nationality, with such other facts as could be ascertained, of parentage, education, occupation and early social influences as seemed to indicate the constitutional and acquired defects and tendencies of the prisoner, and, based upon these, an estimate of his then present condition, and the best probable plan of treatment. And the physician of the penitentiary was required to carefully examine each prisoner when received and enter in a register the name, nationality or race, the weight, stature and family history of each prisoner, also a statement of the condition of the heart, lungs and other leading organs, the rate of the pulse and respiration, and the measurement of the chest and abdomen, and any existing disease or deformity, or other disability, acquired or inherited. Upon the warden's register was to be entered from time to time minutes of observed improvement or deterioration of character, and notes as to the method and treatment employed; also all alterations affecting the standing or situation of the prisoner, and any subsequent facts or personal history brought officially to his knowledge bearing upon the question of the parole or final release of the prisoner; and it was the duty of the warden, or, in his absence, the deputy warden, of each penitentiary to attend each meeting of the Board of Pardons held at the penitentiary of which he was warden, for the purpose of examining prisoners as to

their fitness for parole. He shall advise with that Board concerning each case, and furnish it with his opinion, in writing, as to the fitness of each prisoner for parole whose case the board considered. And it was made the duty of every public officer to whom inquiry was addressed by the clerk of the Board of Pardons, concerning any prisoner, to give the board all information possessed or accessible to him, which might throw light upon the question of the fitness of the prisoner to receive the benefits of parole. § 2.

It was made the duty of the judge before whom any prisoner was convicted, and also the State's Attorney, of the county in which he was convicted, to furnish the board of penitentiary commissioners an official statement of the facts and circumstances constituting the crime whereof the prisoner was convicted, together with all other information accessible to them in regard to the career of the prisoner prior to the time of the committal of the crime of which he was convicted, relative to his habits, associates, disposition and reputation, and any other facts and circumstances tending to throw any light upon the question as to whether such prisoner was capable of again becoming a law-abiding citizen. § 3.

Other sections of the statute are as follows:

" 4. The said Board of Pardons shall have power to establish rules and regulations under which prisoners in the penitentiary may be allowed to go upon parole outside of the penitentiary building and enclosure: *Provided*, That no prisoner shall be released from either penitentiary on parole until the State Board of Pardons or the warden of said penitentiary shall have made arrangements, or shall have satisfactory evidence that arrangements have been made, for his honorable and useful employment while upon parole in some suitable occupation, and also for a proper and suitable home, free from criminal influences, and without expense to the State: *And, provided further*, That all prisoners temporarily so released upon parole shall, at all times, until the receipt of their final discharge, be considered in the legal custody of the warden of the penitentiary from which they were paroled, and shall, during the said time, be considered as remaining under conviction for the crime of which they were.

convicted and sentenced and subject at any time to be taken back within the enclosure of said penitentiary ; and full power to enforce such rules and regulations and to retake and reimprison any inmate so upon parole is hereby conferred upon the warden of said penitentiary, whose order or writ, certified by the clerk of said penitentiary, with the seal of the institution attached, and directed to all sheriffs, coroners, constables, police officers, or to any particular person named in said order or writ, shall be sufficient warrant for the officer or other person named therein to authorize said officer or person to arrest and deliver to the warden of said penitentiary the body of the conditionally released or paroled prisoner named in said writ, and it is hereby made the duty of all sheriffs, coroners, constables, police officers or other persons named therein to execute said order or writ the same as other criminal process. In case any prisoner so conditionally released or paroled shall flee beyond the limit of the State, he may be returned pursuant to the provisions of the law of this State relating to fugitives from justice. It shall be the duty of the warden, immediately upon the return of any conditionally released or paroled prisoner, to make report of the same to the State Board of Pardons, giving the reasons for the return of said paroled prisoner : *Provided, further,* That the State Board of Pardons may, in its discretion, permit any prisoner to temporarily and conditionally depart from such penitentiary on parole and go to some county in the State named and there remain within the limits of the county, and not to depart from the same without written authority from said board, for such length of time as the board may determine, and upon the further condition that such prisoner shall, during the time of his parole, be and continuously remain a law abiding citizen, of industrious and temperate habits, and report to the sheriff of the county on the first day of each month giving a particular account of his conduct during the month and it shall be the duty of such sheriff to investigate such report and ascertain what has been the habits and conduct of such prisoner during the time covered by such report, and to transmit such report upon blanks furnished him by the warden of the penitentiary, to said warden within five days after the receipt of

such prisoner's report, adding to such report the sheriff's statement as to the truth of the report so made to him by the prisoner. It shall also be the duty of such sheriff to keep secret the fact that such prisoner is a paroled prisoner, and in no case divulge such fact to any person or persons so long as said prisoner obeys the terms and conditions of his parole.

" 5. Upon the granting of a parole to any prisoner the warden shall provide him with suitable clothing, ten dollars in money, which may be paid him in installments at the discretion of the warden, and shall procure transportation for him to his place of employment or to the county seat of the county to which he is paroled.

" 6. It shall be the duty of the warden to keep in communication, as far as possible, with all prisoners who are on parole from the penitentiary of which he is the warden, also with their employers, and when, in his opinion, any prisoner who has served not less than six months of his parole acceptably has given such evidence as is deemed reliable and trustworthy that he will remain at liberty without violating the law, and that his final release is not incompatible with the welfare of society, the warden shall make a certificate to that effect to the State Board of Pardons ; and whenever it shall be made to appear to the satisfaction of the State Board of Pardons, from the warden's report or from other sources, that any prisoner has faithfully served the term of his parole, and the board shall be of the opinion that such prisoner can safely be trusted to be at liberty and that his final release will not be incompatible with the welfare of society, *the State Board of Pardons shall have the power to cause to be entered of record in its office an order discharging such prisoner for, or on account of, his conviction, which said order, when approved by the Governor, shall operate as a complete discharge of such prisoner in the nature of a release or commutation of his sentence, to take effect immediately upon the delivery of a certified copy thereof to the prisoner, and the clerk of the court in which the prisoner was convicted shall, upon presentation of such certified copy, enter the judgment of such conviction satisfied and released pursuant to said order.* It is hereby made the duty of the clerk of the Board of Pardons to

send written notice of the fact to the warden of the penitentiary of the proper district whenever any prisoner on parole is finally released by said board." Laws of Ill. 1899, p. 142.

In this connection we are referred to article 3 of the constitution of Illinois, dividing the powers of government into three distinct departments—legislative, executive, judicial—and providing that " no person, or collection of persons, being one of these departments shall exercise any power properly belonging to either of the others, except as hereinafter expressly directed or permitted ; " to section 1 of article 6 of the same constitution, providing that " the judicial powers, except as in this article is otherwise provided, shall be vested in one Supreme Court, Circuit Courts, county courts, justices of the peace; police magistrates and such courts as may be created by law in and for cities and incorporated towns ; " and to section 13 of article 5, providing that the pardoning power shall be in the Governor of the State.

If we do not misapprehend the position of counsel, it is that the Indeterminate Sentence Act of 1899 is inconsistent with the above provisions of the state constitution, in that it confers judicial powers upon a collection of persons who do not belong to the judicial department, and, in effect, invests them with the pardoning power committed by the constitution to the Governor of the State.

We will not stop to consider whether the statute is in conflict with the provisions of the state constitution to which reference is here made. We may, however, in passing observe that a similar statute, previously enacted, was upheld by the Supreme Court of Illinois. *George* v. *The People*, 167 Illinois, 447. It is only necessary now to say that even if the statute in question were obnoxious to the objection now urged by plaintiff in error, it would not follow that this court would review a judgment of the highest court of the State which expressly or by necessary implication sustained it as constitutional. A local statute investing a collection of persons not of the judicial department, with powers that are judicial and authorizing them to exercise the pardoning power which alone belongs to the Governor of the State, presents no question under the Constitution of the

United States. The right to the due process of law prescribed by the Fourteenth Amendment would not be infringed by a local statute of that character. Whether the legislative, executive and judicial powers of a State shall be kept altogether distinct and separate, or whether persons or collections of persons belonging to one department may, in respect to some matters, exert powers which, strictly speaking, pertain to another department of government, is for the determination of the State. And its determination one way or the other cannot be an element in the inquiry whether the due process of law prescribed by the Fourteenth Amendment has been respected by the State or its representatives when dealing with matters involving life or liberty. "When we speak," said Story, "of a separation of the three great departments of government, and maintain that that separation is indispensable to public liberty, we are to understand this maxim in a limited sense. It is not meant to affirm that they must be kept wholly and entirely separate and distinct, and have no common link of connection or dependence, the one upon the other, in the slightest degree. The true meaning is, that the whole power of one of these departments should not be exercised by the same hands which possess the whole power of either of the other departments; and that such exercise of the whole would subvert the principles of a free constitution." Story's Const. (5th ed.) 393. Again: "Indeed, there is not a single constitution of any State in the Union, which does not practically embrace some. acknowledgment of the maxim, and at the same time some admixture of powers constituting an exception to it." Story's Const. (5th ed.) 395.

The objection that the act of 1899 confers upon executive or ministerial officers powers of a judicial nature does not, in our judgment, present any question under the due-process clause of the Fourteenth Amendment.

3. The remaining contention of the defendant is that, under the circumstances disclosed by the record, the second trial of the case placed him twice in jeopardy, and therefore the judgment should be reversed.

Under date of September 1, 1899, the following order was made of record in the case: "This day come the said People,

by Charles S. Deneen, State's Attorney, and the said defendant, as well in his own proper person as by his counsel, also comes; and also come the jurors of the jury aforesaid; and the aforesaid jury hearing the arguments of counsel and instructions of the court, retire in charge of sworn officers to consider of their verdict." And under date of September 2d, this order appears: "This day come the said People, by Charles S. Deneen, State's Attorney, and the defendant, as well in his own proper person as by his counsel, also comes. And also come the jurors of the jury aforesaid, being now returned into court, and, *being unable to agree upon a verdict, are thereupon by order of this court discharged from further consideration of this cause.*"

It seems to be undisputed that the case was submitted to the jury at four o'clock in the afternoon and that the jury having retired to consider of their verdict were kept together until nine o'clock and thirty minutes in the morning of the succeeding day, when they were finally discharged from any further consideration of the case.

The contention is that, notwithstanding the recital in the record that the jury were discharged by the court because they were unable to agree upon a verdict, such discharge was without moral or physical necessity and operated as an acquittal of the defendant.

Upon the face of the question under examination the inquiry might arise whether the due process of law required by the Fourteenth Amendment protects one accused of crime from being put twice in jeopardy of life or limb. In other words, is the right not to be put twice in jeopardy of life or limb forbidden by the Fourteenth Amendment; or, so far as the Constitution of the United States is concerned, is it forbidden only by the Fifth Amendment which prior to the adoption of the Fourteenth Amendment had been held as restricting only the powers of the National Government and its agencies?

We pass this important question without any consideration of it upon its merits, and content ourselves with referring to the decision of this court in *United States* v. *Perez*, 9 Wheat. 579. That was a capital case—in which without the consent of the prisoner or of the attorney of the United States, the jury

being unable to agree were discharged by the court from giving any verdict—this court, speaking by Mr. Justice Story, said: "We are of opinion, that the facts constitute no legal bar to a future trial. The prisoner has not been convicted or acquitted, and may again be put upon his defence. We think, that in all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the judges, under their oaths of office. We are aware that there is some diversity of opinion and practice on this subject, in the American courts; but, after weighing the question with due deliberation, we are of opinion, that such a discharge constitutes no bar to further proceedings, and gives no right of exemption to the prisoner from being again put upon trial." If the due process of law required by the Fourteenth Amendment embraces the guarantee that no person shall be put twice in jeopardy of life or limb—upon which question we need not now express an opinion—what was said in *United States* v. *Perez* is applicable to this case upon the present writ of error and is adverse to the contention of the accused that he was put twice in jeopardy.

The principles settled in *United States* v. *Perez*, we may remark, were reaffirmed in *Ex parte Lange*, 18 Wall. 163, 175; *Simmons* v. *United States*, 142 U. S. 148; *Logan* v. *United States*, 144 U. S. 263; *Thompson* v. *United States*, 155 U. S. 271, 274.

The conclusion is, that the judgment of the Supreme Court of Illinois did not deny to the plaintiff in error any right secured by the Constitution of the United States, and is therefore

*Affirmed.*