**Wilmer Oliver ROWE, Jr., Petitioner,**

v.

**E.M. GRIZZARD, Warden, et al., Respondents.**

Civ. A. No. 83–0472–R.

United States District Court,
E.D. Virginia,
Richmond Division.

July 10, 1984.

Michael Morchower, Richmond, Va., for petitioner.

Donald R. Curry, Asst. Atty. Gen., Richmond, Va., for respondents.

## MEMORANDUM

MERHIGE, District Judge.

This matter is before the Court on the petition of Wilmer Oliver Rowe, Jr. for a writ of habeas corpus. Rowe was convict-

ed in the Circuit Court of the City of Virginia Beach of malicious wounding, simple assault, and conspiracy to commit malicious wounding, for which he was sentenced to serve 15 years, 12 months, and 10 years respectively. Rowe challenges the validity of his conviction on the following twenty grounds:[1]

A. the trial court erred by failing to excuse certain jurors for cause;

B. the trial court erred by refusing to allow the defense to cross-examine petitioner's wife concerning her civil suit against Rowe;

C. the trial court erred by failing to ascertain on April 18, 1979 whether jurors had been exposed to certain news accounts of petitioner's trial;

D. the trial court erred by permitting certain witnesses for the Commonwealth to testify on direct examination concerning their plea agreements;

E. the Commonwealth failed to correct the perjured testimony of co-defendant Hayes and in fact induced such perjured testimony;

F. co-defendant White misrepresented his plea agreement to the jury and did so at the direction of the prosecutor;

G. co-defendant Riddick misrepresented his plea agreement to the jury and did so at the direction of the prosecutor;

H. petitioner was prejudiced in the jury's deliberations on his sentence by the disparity between the plea agreements testified to by the co-defendants and the sentences they actually received;

I. the trial court erred by refusing to require the prosecution to disclose the identity of the police officer who took the statement of a certain witness for the prosecution;

J. the Commonwealth failed to disclose exculpatory information;

K. the trial court erred by failing to require the Commonwealth to produce to the defense the pre-trial statements of Rowe's alleged co-conspirators;

---

1. Rowe's claims are identified herein by the letter he assigned them in his petition to this Court. It should be noted that Rowe arranged and identified his claims differently in one or more of the state proceedings.

L. the trial court erred by refusing to declare a mistrial on the basis of improper and prejudicial arguments made by the prosecutor;

M. petitioner was illegally arrested in violation of *Va. Code* § 19.2–76;

N. petitioner was illegally arrested in that the arrest warrants were issued in the absence of probable cause or were based upon perjured statements;

O. petitioner's conviction for simple assault violates the Double Jeopardy Clause;

P. petitioner's conviction for simple assault violates due process;

Q. petitioner was the victim of prosecutorial vindictiveness;

R. petitioner's rights were violated by an arbitrary reinterpretation of the good time laws affecting parole eligibility;

S. petitioner's rights under the Equal Protection Clause were violated by the fact that some inmates sentences have been computed differently than petitioner's;

T. petitioner's due process rights were violated by a change in his parole eligibility date in the absence of a due process hearing.

Rowe has fully exhausted his state remedies, hence jurisdiction is available pursuant to 28 U.S.C. § 2254.

Rowe filed a legal memorandum in support of his petition. The Attorney General of Virginia has filed a motion to dismiss on behalf of the respondents, with a supporting memorandum. The Virginia court records from Rowe's original trial and from the state habeas proceeding have been made available to the Court. The Court, having reviewed these submissions, is satisfied that no further evidentiary hearing is necessary, and the matter is ripe for disposition.

### Procedural History

Rowe was convicted on June 6, 1979. His petition for appeal to the Supreme Court of Virginia was denied on March 10, 1980. He then filed a petition for a writ of habeas corpus in the Circuit Court of the City of Virginia Beach, raising the claims identified *supra* as A through L. The Circuit Court dismissed most of the claims on preliminary motions and held a plenary hearing on the claims identified *supra* as E, F, G, and H. The Circuit Court made factual findings on the issues addressed in the hearing and denied the petition in its entirety on February 17, 1982.

Rowe then filed a petition in the Supreme Court of Virginia, raising the claims denied below plus eight additional claims, which are identified *supra*, as M through T. The Supreme Court denied the petition for appeal on claims A through L and denied habeas relief as to the additional claims M through T.

### Facts

The Commonwealth's theory of the case was that Rowe, during the period from late summer until December 18, 1978, conspired with four men: James Riddick, Luther Hayes, Boone White, and Angelo Burke. Riddick, Hayes, and White agreed to maliciously wound Rowe's estranged wife, Kathy Rowe, in exchange for $10,000 from Rowe. Burke's role was as middleman in some parts of the conspiracy. Rowe was convicted for the conspiracy itself; as an accomplice in an assault on his wife that took place on November 15, 1978; and as an accomplice in a malicious wounding of her that took place on December 18, 1978.

Certain facts are not controverted. On November 15, 1978, Hayes, Riddick and White drove from their home in North Carolina to Kathy Rowe's Virginia Beach apartment and waited for her to appear. When White observed her searching for her keys, he walked up to her car and asked her for the time. He then displayed a gun to her, and she fled. (The evidence later showed that the gun was not operational and the intent was to scare Mrs. Rowe but not to hurt her.) Kathy Rowe reported the incident to the police.

A few days later Riddick called the Virginia Beach Police Department and, identi-

fying himself as an FBI informer, told the police that Rowe should be picked up in connection with the November 15 incident. When pressed for details, he offered to cooperate in exchange for money, but he found the police's offer of $350 insufficient, and he terminated the contact.

On December 18, 1978, defendant Rowe met Kathy Rowe for lunch. She testified that she came in response to a telegram from him indicating that if she would agree to meet him, he would help her pay some of her bills. At lunch they arranged to meet again at 6 p.m. that evening, at Rowe's paint store. Kathy Rowe testified that he told her to meet him at precisely 6 p.m., which she did.

When Rowe arrived, he unlocked the store, turned on the lights, and they entered the store together. Shortly thereafter, a man, whom Kathy Rowe later identified as White, entered the store and indicated he wished to purchase a Christmas present. White then pulled a gun, grabbed Kathy Rowe, and told Rowe to lock the front door. He did so. White demanded money, then indicated that the amount provided was not enough. He forced Kathy Rowe to lie face down on the floor and shot her in the back, near the base of her spine, and kicked her. Riddick, who meanwhile had entered through the back door, then took the gun and shot Kathy Rowe in the abdomen.

White and Riddick took the cash box and ran out the back door to where Hayes waited with a get-away car, and the three returned to North Carolina until their arrest for the shooting. Rowe called the rescue squad and the police from the paint store. Kathy Rowe testified that she took the phone from him because he was mumbling, and she gave the authorities the necessary information.

The controverted issues concern Rowe's role in bringing about the assaults on his wife. The Commonwealth's evidence consisted primarily of phone records, cancelled checks from Rowe, and testimony from Riddick, White, Hayes, and Burke.

Burke, an employee of Rowe, testified that sometime during the summer of 1978 Rowe approached him and asked him for assistance in having Rowe's estranged wife harmed. In response to this request, Burke arranged to have Riddick meet Rowe at Rowe's plant. Burke saw Riddick when he met with Rowe but was not privy to the details of their conversation. Riddick testified that he and Rowe discussed at that meeting the proposal to shoot Rowe's wife. Rowe did not deny that the meeting occurred, but he stated that Riddick was there simply to seek employment at the plant.

Riddick testified that he had further contact with Rowe by phone from his home in Hertford, North Carolina to Rowe's business and apartment. Phone records confirmed such calls. Rowe testified that Burke had access to both his business and his apartment, and that Burke made all the calls in question. Burke denied this. Additionally, defense witnesses testified that Rowe was somewhere else when an inculpatory call was alleged to have been made on the morning of December 18, 1978.

Hayes, in addition to testifying as to his role as driver in both the November 15 and December 18 incidents, testified that on another trip to Virginia Beach before December 18, he and Riddick met with Rowe, who showed them where his paint store was and gave Riddick money to buy a gun.

Burke testified, and Riddick confirmed, that Burke delivered two cash payments from Rowe to Riddick, in the amounts of $2,000 and $4,500. Riddick testified that Rowe himself delivered a third payment of $4,000. Check records confirmed that on each occasion Rowe had cashed a check for the amount involved, or slightly more, shortly before the payoff allegedly took place. Rowe offered explanations as to each of these cash withdrawals. According to his testimony, one was for a C.O.D. delivery at his plant; another was lost on gambling; and another was split between payments to a former wife and a down payment on a new car.

### Discussion

*Waived Claims: A, B, C, D and K*

▓▓ Claim C, *supra* p. 392, was not raised at trial, as Virginia's contemporaneous objection rule requires. For this reason, the Circuit Court declined to entertain this claim in the state habeas action. Virginia's contemporaneous objection rule provides an independent state law ground for denying this claim, and a federal court must honor it absent "cause" for the failure to comply with the rule and resultant "prejudice." *Wainwright v. Sykes*, 433 U.S. 72, 84, 97 S.Ct. 2497, 2505, 53 L.Ed.2d 594 (1976). The petitioner has not made any attempt to show the requisite cause and prejudice; hence *Wainwright v. Sykes* compels denial of this claim.

▓▓ Claims A, B, D and K, *supra* pp. 392, were objected to at trial but were not raised in Rowe's direct appeal. *Wainwright v. Sykes, supra,* prevents the Court from entertaining these claims as well. *Cole v. Stevenson*, 620 F.2d 1055 (4th Cir.1980); *cf. Ferguson v. Boyd*, 566 F.2d 873 (4th Cir.1977).[2]

### Claims E, F, G and H

These claims relate to Rowe's co-conspirators' testimony regarding their plea agreements with the Commonwealth. Hayes testified that he had entered into a plea agreement whereby he would testify at Rowe's trial, and he would receive a 10 year sentence for his complicity in the two assaults. He was in fact sentenced to 20 years with 13 years suspended, resulting in a net sentence of 7 years, or 3 years less

than that to which he testified. This sentence was later modified to run concurrently with a 50-year-to-life sentence he subsequently received on other charges in North Carolina.

White testified that his plea agreement was for a 15-year sentence. Subsequently, he was sentenced to 20 years with 8 suspended, all to run concurrently with a later North Carolina sentence of 50 years to life.

Finally, Riddick testified that his agreement was for 20 years. He was sentenced to 20 years with 4 suspended, all to run concurrently with a later North Carolina sentence of 50 years to life.

In claims E, F, and G, Rowe claims that Hayes, White and Riddick respectively testified falsely at his trial as to their plea agreements; that their false testimony was at the direction of the Commonwealth's Attorney; and that consequently his due process rights were violated. In claim H, Rowe asserts that the jury was swayed to his prejudice in its deliberations on his sentence by the false testimony on the plea agreements.

The judge of the Circuit Court of the City of Virginia Beach held a plenary hearing on these claims, at which testimony was introduced from Hayes, Riddick, White, the Assistant Commonwealth's Attorney who had bargained with them and who had tried the case against Rowe, and attorneys who had represented these men in their plea negotiations. The Court found as a matter of fact that Hayes's testimony at Rowe's trial about his plea agreement was false. The court found that Hayes

---

**2.** Arguably the applicability of *Cole v. Stevenson* could be restricted to North Carolina cases, as the opinion relies heavily on certain peculiar aspects of North Carolina procedural law not present in other states, including Virginia. The overwhelming majority of cases citing *Cole v. Stevenson* are North Carolina cases, and in the few non-North Carolina cases, the reference to *Cole v. Stevenson* appears to be *dicta. See, e.g., Bradley v. Davis*, 551 F.Supp. 479, 482 (D.Md. 1982); *Adkins v. Bordenkircher*, 517 F.Supp. 390, 395 (S.D.W.Va.1981), *aff'd* 674 F.2d 279 (4th Cir.1982).

If *Cole v. Stevenson* is limited to North Carolina, then *Ferguson v. Boyd* would still be good

law in Virginia. *Ferguson v. Boyd* held that *Wainwright v. Sykes* did not compel denial of relief where the petitioner had properly objected at trial but had not directly appealed his conviction. Assuming *arguendo Ferguson v. Boyd* is good law, the facts of this case are distinguishable. Unlike Ferguson, Rowe did file an appeal. He simply chose to omit some of the claims he now raises from that appeal. In this circumstance, unlike in *Ferguson v. Boyd,* the rationale of *Wainwright v. Sykes* is fully applicable. *See Holcomb v. Murphy,* 701 F.2d 1307, (10th Cir.1983) (dissent).

knew, when he testified, that the Assistant Commonwealth's Attorney had informed Hayes's attorney that he would agree to a further reduction, beyond the 10 years that had already been arranged and to which Hayes testified. The Assistant Commonwealth's Attorney had declined to formalize the further reduction until after Rowe's trial, but Hayes knew that something would be forthcoming.

On the other hand, the Circuit Court found that White's and Riddick's testimony at Rowe's trial accurately reflected their agreements at the time they testified. Although the Commonwealth's Attorney later agreed to a further reduction of their sentences, the change took place after their testimony, and they (unlike Hayes) had no reason to anticipate it.

■ The Circuit Court's factual findings on these points are binding on this Court. At the plenary hearing, various witnesses gave contradictory accounts as to the nature of the plea agreements in effect when Hayes, White, and Riddick testified. The Circuit Court was in a position to observe the witnesses' credibility first-hand, and its resolution of the various contradictions in the evidence is adequately supported in the record. Accordingly, this Court presumes the Circuit Court findings to be correct. 28 U.S.C. § 2254(d).

■ Hayes's false testimony would amount to a due process violation necessitating a new trial if, *and only if,* there is any reasonable likelihood that it could have affected the judgment of the jury. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1971); *United States v. Meinster,* 619 F.2d 1041 (4th Cir.1980); *Boone v. Paderick,* 541 F.2d 447, 449 (4th Cir.1976). Both the importance of Hayes' testimony and the weight of the independent evidence of guilt are relevant to this determination. *Boone v. Paderick,* 541 F.2d at 451.

■ In the Court's view, there is no such reasonable likelihood in this case. Hayes was not a key witness. *Cf. Boone v. Paderick,* 541 F.2d at 452. Regarding the controverted issue—Rowe's role in the conspiracy—Hayes' testimony added little. In addition, the independent evidence of Rowe's complicity was overwhelming. In light of the testimony of Riddick and Burke, corroborated by the phone and check records, there is no reasonable likelihood that the jury's judgment would have been any different about Hayes's false testimony.

The Court notes that this is not a case where the jury was led to believe that the witness was testifying without any inducement whatsoever. *Cf. Boone v. Paderick,* 541 F.2d at 450. The jury was told that Hayes had a deal for a 10 year sentence. Although his testimony might have been given still less credibility if the jury had known that his sentence was to be reduced by some additional amount, the jury already had reason to specifically consider bias in his testimony.

■ The Court does not, of course, condone the prosecution's conduct at Rowe's trial. If the Circuit Court's factual findings are correct, as the Court presumes them to be, then the prosecutor's conduct in allowing Hayes' false testimony was inexcusable, or at the very least premised on an irrational justification. The Circuit Court of Virginia Beach found that the Assistant Commonwealth's Attorney, when agreeing on the eve of Rowe's trial to a further reduction in Hayes' sentence, told Hayes's attorney that he did not want the further reduction agreement formalized for fear that Rowe's attorneys might then confuse Hayes on cross examination. Juries are the ultimate triers of fact and cross examination, a useful and time honored method in our system leading, hopefully, to the truth. For a prosecutor to permit the suppression of facts on the basis of concern that the witness might be confused by cross examination is to cross the line between prosecutor and juror. Neither inexperience, nor enthusiasm for conviction, as one might suspect played a part in the prosecution's actions here, though understandable can render such conduct excusable, nor should there be any doubt of its

evil—regardless of the perceived justification.

Nevertheless, the intent of the *Giglio* and *Boone v. Paderick* holdings is not to punish the prosecutor. *United States v. Meinster*, 619 F.2d at 1044. The primary concern is to ensure that the jury was not misled to the defendant's detriment. *Id.* The Court is satisfied that it was not. Claims E, F, and G are not well-taken.

■ Claim H is slightly different. In it, Rowe claims that the false testimony on plea bargains influenced the jury's deliberations on his sentence, above and beyond any influence it may have had on the jury's evaluation of the witnesses's credibility. He points out that the sentence he received on the malicious wounding count—15 years—was an exact average of the sentences that Hayes, Riddick, and White testified that they expected to receive—10, 20, and 15 years respectively. Rowe argues that if these men had told the jury that their sentences would have been less, he too would have received a lesser sentence. Of course, Rowe's argument is limited by the Court's holdings, *supra*, to the contention that *Hayes's* false testimony influenced his sentence.

The Court is satisfied that this argument is purely speculative, and baseless speculation at that. Many factors play into sentencing determinations, and the Court can never be certain as to how the jury arrived at the amounts fixed. Even assuming *arguendo* that the jury used the reasoning Rowe suggests, Burke's one-year plea bargain presumably would have been averaged in as well, which would have yielded an 11½ year sentence for Rowe rather than the 15-plus that he received. Hence Rowe's speculative argument fails even on its own terms. The Court is satisfied that there is no reasonable likelihood that Hayes's false testimony affected Rowe's sentence.

### Claim I

Prior to trial the Commonwealth's Attorney disclosed to the defense, in response to a specific discovery request, a number of statements that Rowe had allegedly made to prosecution witnesses. One of these was that Rowe allegedly asked Angelo Burke to "rough up" his wife. At trial, Burke testified instead that, " ... he (Rowe) wanted to have his wife harmed critically. He wanted to have her shot."

The defense sought to impeach Burke with his "prior statement,"[3] but could not do so directly, as Burke denied having made it.[4] So Rowe's attorneys sought disclosure from the Commonwealth's Attorney of the identity of the officer who had taken the statement from Burke. The Commonwealth's Attorney refused to provide it. Rowe claims that the refusal to disclose this information denied him his right to a fair trial.

■ If a defendant is refused access only to impeachment evidence that would have been "merely cumulative" or would have had "no significant effect on the witness' credibility," the conviction should not be overturned. *Sennett v. Sheriff of Fairfax County*, 608 F. 537, 538 (4th Cir.1979); *United States v. Figurski*, 545 F.2d 389, 391–392 (4th Cir.1976). The Court is satisfied that this is the case here.

■ The key issue at trial was whether Rowe was a participant in the conspiracy to harm his wife. In that context, "roughing her up" is merely a more general expression that does not deviate significantly in meaning from "having her shot." There being no significant variance between Burke's prior statement and his testimony, the Court is satisfied that the supposed

---

**3.** The item Rowe describes as Burke's "statement" is actually a line in a document signed by the Commonwealth's Attorney, purporting to set forth what Burke (and others) had accused Rowe of saying. So the choice of wording may be that of the Commonwealth's Attorney rather than Burke.

**4.** The trial record reflects that Burke may have misunderstood the question and may not have intended flatly to deny having given the prior statement.

impeachment evidence would have had no significant effect on Burke's credibility.

This is even clearer if Burke's "prior statement" is read in its entirety. As paraphrased by the Commonwealth's Attorney,[5] it reads as follows: "the defendant asked Angelo Burke to 'rough up' or in some manner have his wife (Kathy Rowe) and further stated that Burke 'owed' him because Rowe had 'taken care' of Burke's wife's medical bills ...." [sic.] Although obviously a word or phrase was accidentally omitted, the quote shows that in his prior statement Burke did not limit his accusation against Rowe to a request specifically to "rough up" Rowe's wife. Thus, Burke's use at trial of different phraseology does not impinge significantly on his credibility, and Rowe was not denied a fair trial.

*Claim J*

Rowe's defense counsel asked in pre-trial discovery motions for statements made by co-defendants and/or other witnesses which either contradicted others' statements and/or were internally inconsistent. The defense also sought to have the trial court inspect the prosecution's files *in camera* to ensure that all such material had been produced. The trial court declined, commenting that in its view it was the prosecution's burden to comply with the *Brady* request.

■ The Court sees nothing objectionable in the procedure the trial court followed. Absent a more specific request than was made, the trial court is not required to make an *in camera* inspection of the prosecution's entire file.

■ Nor is there any indication that the prosecution failed to fulfill its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Rowe argues that the trial testimony revealed exculpatory material that was not disclosed before trial, to wit, alleged contradictions between and within the accounts of the prosecution witnesses on dozens of particulars. The Court notes that

all the examples Rowe offers, with one exception, are variances between two or more witnesses' accounts of the same event. If the prosecution had suppressed a varying pre-trial account from a witness by neither calling the witness to testify nor disclosing the witness's existence to the defense, *Brady* might have been implicated. But here, the witnesses with varying accounts were all called to testify. The defense was able to cross-examine them, and the jury was able to evaluate the significance of the contradictions. In these circumstances *Brady* is not implicated.

The only example Rowe cites that does not fall into this class is the police report summarizing Kathy Rowe's account of the December 18 incident. Rowe contends that the report, which the defense did not see until after trial, indicates that her initial account to the police was considerably different from her trial testimony.

■ The defense did not make a specific request for this report. Consequently, failure to disclose it does not constitute a denial of due process unless the report was of sufficient probative value to create a reasonable doubt of guilt where none otherwise existed. *United States v. Agurs*, 427 U.S. 97, 103–07, 96 S.Ct. 2392, 2397–99, 49 L.Ed.2d 342 (1976). The police report's summary of Kathy Rowe's account is not of such probative value. The Court sees no significant variations between it and her trial testimony. In any event, Kathy Rowe's testimony, which recounted her first-hand observations of the assaults on her, had little relevance to the controverted issue of Rowe's participation. Absent a specific request, the prosecution had no duty to disclose the police report.

*Claim L*

Rowe cites seven prejudicial prosecutorial remarks, two in the Commonwealth's opening argument and five in its closing, which he claims deprived him of a fair trial. It should be noted that his contention is a simple, though significant, due process

5. See n. 3, *supra*.

claim. Rowe testified at trial on his own behalf and hence has no objection to the remarks on grounds of interference with his constitutional right against self-incrimination.

First, the prosecutor told the jury in his opening that "Kathy Rowe told the police [after the November 15 assault] she suspected her husband because of their past difficulties." The defense objected and moved for a mistrial on the ground that the suspicion would not be admissible as evidence. The trial court declined to declare a mistrial, but cautioned the jury to disregard the statement.

There is no doubt that the prosecutor's remark was improper. Kathy Rowe's suspicion was not admissible, and the prosecutor should have known that. However, the test that a habeas petitioner must meet to win a new trial on this ground is a heavy one. For the impropriety to be of constitutional magnitude, "the prosecutorial remarks must be so prejudicial that they render the trial fundamentally unfair. [Citations omitted.]" *Darden v. Wainwright,* 699 F.2d 1031, 1034 (11th Cir.1983), *rev'd on other grounds,* 725 F.2d 1526 (11th Cir. en banc 1984), *cert. den.* —— U.S. ——, 104 S.Ct. 2688, 81 L.Ed.2d 882 (1984); *Mechling v. Slayton,* 361 F.Supp. 770, 774 (E.D. Va.1973). Further, in making this determination, "The comments must be evaluated in the context not only of the prosecutor's entire [closing] argument but of the trial as a whole. [Citations omitted.]" *Darden v. Wainwright,* 699 F.2d at 1034.

Applying this test, the Court is satisfied that the prosecutor's remark did not render the trial fundamentally unfair so as to require a new trial. Significant to this conclusion is the trial judge's immediate admonition to the jury to disregard the statement. *See United States v. Moore,* 710 F.2d 157, 159 (4th Cir.1983); *United States v. Johnson,* 610 F.2d 194, 197 (4th Cir. 1979). Also significant was the compelling independent evidence of Rowe's complicity. *See supra.*

The second remark of which Rowe complains, also in the opening statement, was as follows:

Wasn't more than thirty minutes passed from the time the first individuals were arrested by the FBI and the local state authorities and we had this whole story which I have just released to you.

Although, as Rowe contends, this remark may have tended improperly to bolster the testimony of the prosecution witnesses, any such effect would have been negligible, especially in light of the independent evidence of Rowe's guilt. The remark did not render the trial fundamentally unfair.

The third allegedly improper statement, in the prosecution's closing argument, was a reference to the defense's waiver of opening statement on the first day of trial. The prosecutor suggested that Rowe and his lawyers used a "fill-in-the-gaps" defense, waiting until the prosecution's case had been completed before coming up with their "story."

As with the first statement Rowe cites, the Court has no doubt that the remark was improper. However, the Court is equally satisfied that in context it did not render the trial fundamentally unfair. The defense objected, and the trial court gave a cautionary instruction that the remarks were just argument. *See United States v. Moore, supra.*

The fourth, fifth, sixth and seventh remarks Rowe cites were all comments in closing argument to the effect that the defense had failed to produce certain evidence. This, Rowe contends, was an attempt to shift the burden of proof improperly to the defense.

Rowe's counsel did not object to these remarks at trial, as Virginia's contemporaneous objection rule requires, hence he is now barred from challenging them absent cause and prejudice. *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Rowe contends that the remarks constituted "plain error" thereby relieving him of compliance with the state procedural rule. The "plain error

doctrine" has no place in a collateral attack on a criminal conviction. *United States v. Frady*, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). In any event, given that Rowe testified on his own behalf and presented at least a partial alibi defense, the Court is satisfied that the impropriety, if any, of these remarks was not so great as to require a new trial. The jury was properly and fully instructed on the burden of proof. *See also United States v. Anderson*, 481 F.2d 685, 701 (4th Cir.1973), *aff'd on other grounds*, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974).

### Claims M and N

These two claims relate to alleged irregularities in Rowe's arrest.[6] Rowe alleges in Claim M that Virginia Beach police officers arrested him in Norfolk, on a warrant issued in Virginia Beach, and that they then took him to Virginia Beach for a bail hearing. He alleges that the crossing of city limits in this manner violated *Va.Code* § 19.2–76.

■ This claim is based solely on state law. Rowe does not allege any violation of the Constitution or laws of the United States in this regard. Accordingly, the issue is not cognizable in a federal habeas corpus petition. 28 U.S.C. § 2254.

■ Rowe alleges in Claim N that his arrest warrant was issued without probable cause. The basis of his claim is as follows: Rowe was arrested on January 5, 1979, on two counts of attempted murder for hire. At the preliminary hearing on January 31, 1979, the Commonwealth's Attorney asked that the charges be reduced to malicious wounding, etc. At trial, the Commonwealth's Attorney represented in his opening statement that the police officials "had the whole story" of what happened within 30 minutes after the first arrests.

Rowe's argument is that if the police had all the information from the beginning, then the initial "over-charge" either was not based on probable cause or was based on perjured testimony to the Magistrate.

This argument borders on the frivolous. The Commonwealth's Attorney's opening statement is not evidence, nor can the inference Rowe makes from it fairly be treated as anything but speculation. In any event, a claim of illegal arrest ordinarily "presents no ground for habeas corpus relief when a convicted criminal defendant does not claim that he was denied a fair trial by the introduction of evidence which came from the illegal arrest." *Crowell v. Zahradnick*, 571 F.2d 1257, 1259 n. 3 (4th Cir.1977); *see also Gerstein v. Pugh*, 420 U.S. 103, 119, 95 S.Ct. 854, 865, 43 L.Ed.2d 54 (1975). Rowe has made no such claim, and the Court sees nothing in the instant record to justify an exception to the ordinary rule.

### Claims O and P

Both these claims relate to Rowe's conviction of simple assault for the incident that occurred on November 15, 1978, a month before the shooting at the paint store. Rowe was indicted for attempted malicious wounding in connection with the November 15 incident, and the prosecution presented its case on that charge. At the end of the prosecution's case, the defendant moved to strike this charge for insufficient evidence. The trial court sustained the motion, and the court then took a recess for lunch. After the recess, and on motion of the Commonwealth's Attorney, the trial court reinstated the previously dismissed charge as a simple assault charge, and Rowe was convicted of simple assault on sufficient evidence.

*Murch v. Mottram*, 409 U.S. 41, 93 S.Ct. 71, 34 L.Ed.2d 194 (1972). However, because the Virginia Supreme Court chose to address claims M, N, Q, R, S, and on the merits, this Court must do likewise. As to claims O and P, see n. 7, *infra*.

---

**6.** Claims M through T were not raised in Rowe's original habeas petition to the Circuit Court of Virginia Beach. Accordingly, had the Supreme Court of Virginia denied them on that procedural ground, this Court perhaps would have been barred from considering them on the merits.

■ Rowe challenges this procedure on two grounds.[7] Claim O is that reinstatement of the charge violated his constitutional right not to be put in jeopardy twice for the same offense. This claim is without merit. Prompt reinstatement during the course of a single trial, in which the original jury had not been discharged, does not constitute a "second trial." *United States v. Lorusso*, 695 F.2d 45 (2nd Cir. 1982).

■ In claim P Rowe argues that reinstatement of the attempted malicious wounding indictment as a simple assault charge changed the nature of the offense charged and that consequently the reinstatement violated his right under the Virginia Constitution to notice of the precise nature of the charge he faced. Article I, Section 8 of the *Constitution of Virginia*.

This claim does not allege any violation of the laws or Constitution of the United States and hence is not cognizable in this federal habeas corpus proceeding. 28 U.S.C. § 2254.

*Claim Q*

■ Rowe's claim of prosecutorial vindictiveness stems from the fact that five days after his preliminary hearing on charges of malicious wounding and attempted malicious wounding, additional indictments, arising out of the same conduct, were issued for abduction, use of a firearm, conspiracy to commit malicious wounding, and malicious wounding. Rowe asserts that the additional indictments were not triggered by any new information because, according to the prosecutor's opening statement, the police got all the information the day of the first arrests.

Rowe's argument is that the addition of new charges absent new information is presumptive evidence of prosecutorial vindictiveness. This claim is without merit. The

Supreme Court has held that no such presumption applies to pre-trial additions of charges. *United States v. Goodwin*, 457 U.S. 368, 382, 102 S.Ct. 2485, 2493, 73 L.Ed.2d 74 (1982).

*Claims R, S, and T*

■ Rowe was sentenced on June 6, 1979 to a twenty-six year sentence. He asserts that his parole eligibility date was originally calculated to be May 2, 1983, but that as a result of a reinterpretation by the Virginia Attorney General of the "good time" provisions of Virginia law, his parole eligibility date has been changed to late 1984. Claims R, S and T all arise out of this change.

Rowe's brief fails to cite either the statute that has allegedly been reinterpreted to his detriment or the Attorney General's Opinion that allegedly effected the reinterpretation. Nor has he provided any records to support his assertions as to when he originally was eligible for parole and when he currently is eligible. Consequently, the Court cannot now resolve Claims R, S, and T on the merits. These claims will be denied without prejudice, leaving Rowe free to raise them in a proceeding under 42 U.S.C. § 1983. *See Strader v. Troy*, 571 F.2d 1263, 1269 (4th Cir.1978). See, however, *Fore v. Coleman*, C.A. No. 80–0748–R (E.D.Va., May 18, 1981) (copy attached as Appendix A), which casts doubt on the possibility that Rowe can prevail even if he properly supports his claim with the information referenced above.

*Conclusion*

The Court having considered and rejected each of the claims Rowe makes in support of his petition, the petition will be denied.

An appropriate order will issue.

---

7. The Virginia Supreme Court denied habeas relief on claims O & P on the ground that Rowe failed to raise them on direct appeal. Rowe's petition for appeal, however, raised these exact two claims. See *Petition for Appeal*, September 24, 1979, pp. 30–34. Accordingly, the claims are addressed on the merits herein.

## APPENDIX A

IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA RICHMOND DIVISION

THEODORE G. FORE, et al.

v.

J. MARSHALL v. COLEMAN, et al.

CIVIL ACTION NO. 80–0748–R

MEMORANDUM

MERHIGE, District Judge.

Theodore G. Fore, John P. Lyell, and Andrew J. Leibert, inmates at the Virginia State Penitentiary, proceeding *pro se* and *in forma pauperis*, bring this § 1983 complaint seeking monetary and declaratory relief for alleged violations of their constitutional rights. By order of March 27, 1981, plaintiffs were directed to file an amended complaint to clarify the extent of their claims. Plaintiffs have now done so.

### A.

Plaintiffs' first claim is that the Virginia Attorney General's October 1979 interpretation of the effect of Virginia Code § 53–251.3 violates their rights under the Ex Post Facto Clause of the Constitution.

Section 53–251.3, which became effective on July 1, 1979, provides:

Discharge on parole. Every person who is sentenced and committed under the laws of the Commonwealth to any State correctional institution or as provided for in § 19.2–308.1 shall be discharged on parole by the Virginia Parole Board when six months remain in the person's sentence until his date of final discharge; provided, however, each person so sentenced or committed shall serve a minimum of three months of his sentence prior to such a discharge. Such persons who are so discharged on parole shall be subject to a minimum of six months' supervision and such an additional period

of parole as the Board deems appropriate in accordance with § 53–255.

Plaintiffs complain that Marshall Coleman's October 1979 interpretation of this provision results in their being credited four months rather than the six months granted by the legislature, and that his interpretation unconstitutionally increased the punishment they received for their crimes.

As the Supreme Court has recently stated:

The *ex post facto* prohibition forbids the Congress and the States from enacting any law 'which imposes a punishment for an act which is not punishable at the time it was committed or imposes additional punishment to that then prescribed.'

*Weaver v. Graham* [450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17], 49 L.W. 4155, 4156 (February 24, 1981). Plaintiffs admit in their original complaint that they were all convicted prior to July 1, 1979, the effective date of § 53–251.3. Complaint, page 2. Section 53–251.3 did not, of course, impose additional punishment. To the contrary, it reduced the amount of punishment plaintiffs expected to receive. More importantly, the Attorney General's October 1979 interpretation of § 53–251.3 did not increase the amount of punishment plaintiffs would have received under the laws in effect at the time they committed their crimes. Rather, the interpretation merely reduced the benefit they expected to derive from the passage of the statute. The end result of the passage and interpretation of § 53–251.3 is, in plaintiffs' own view, to reduce by four months the amount of punishment they would have received under the law in effect at the time they committed their crimes. There has been no violation of the Ex Post Facto Clause here.[1] This claim must be dismissed.

### B.

Plaintiffs' second claim is that the Attorney General of Virginia exceeded his au-

---

1. The Court expresses no opinion as to any claims by individuals who committed crimes after July 1, 1979, but before October 1979.

thority by "lightly" interpreting the statute. Plaintiffs claim, additionally, that he usurped the legislative authority of the state and thus deprived them of due process. "One of the fundamental beliefs of a democracy is that the laws of the land shall be the will of the people expressed by their elected representatives in statehouses across the county." Amended complaint, paragraph 2.

This claim must be rejected. First, the Court notes that the doctrine of separation of powers embodied in the Federal Constitution is not mandatory in the states. In *Dreyer v. Illinois*, 187 U.S. 71 [23 S.Ct. 28, 47 L.Ed. 79] (1902), the Supreme Court held:

> Whether the legislative, executive and judicial powers of a state shall be kept altogether distinct and separate, or whether persons or collections of persons belonging to one department may, in respect to some matters, exert powers which, strictly speaking, pertain to another department of government, is for the determination of the state. And its determination one way or the other cannot be an element in the inquiry, whether the due process of law prescribed by the 14th Amendment has been respected by the state or its representatives when dealing with matters involving life or liberty.

*Id.*, at 83–84 [23 S.Ct. at 32]. See also *Whalen v. United States*, 443 [445] U.S. 684, 689 n. 4 [100 S.Ct. 1432, 1436 n. 4, 63 L.Ed.2d 715] (1980), and the cases cited therein.

Moreover, assuming that an interpretation of state law by the Attorney General which arbitrarily deprives plaintiffs of their liberty is a denial of due process, plaintiffs are not entitled to relief. The Attorney General's October 1979 interpretation of § 53–251.3 is clearly reasonable. Section 53–213 of the Virginia Code grants ten days credit to every inmate for every twenty days he has served without misbehaving. Pursuant to § 53–213, Department of Corrections officials would inform an inmate with a six year sentence that he would be released in four years if he behaved, since after the completion of four years he would have earned two years of good time credit. When § 53–251.3 was enacted, calling for the release of inmates when only six months remain on their terms, correctional officials would inform the inmate with a six year sentence that he would be released in three and a half years. The Attorney General's interpretation points out the problem with computing time this way:

> When an inmate is released six months before his date of final discharge, it means, however, that he could not have actually earned 60 days of good conduct credit which he normally would earn during this 6-month period.

The Attorney General's interpretation of § 53–251.3 forbids granting an inmate good time credits for time not actually served. This is not unreasonable.

The complaint must be dismissed.

An appropriate order shall issue.

Date: May 18, 1981